# RADICE CORPORATE CENTER III

## INDEX TO STANDARD OFFICE LEASE

| | | | |
|---|---|---|---|
| 1. | Basic Lease Rider | Standard Office Lease | Page 1, 2, 3 |
| 2. | Article 1. | Premises | Page 4 |
| 3. | Article 2. | Term of Lease and Commencement | Page 4 |
| 4. | Article 3. | Base Rent, Rent Escalation and Security Deposit | Page 4,5 |
| 5. | Article 4. | Construction of Premises | Page 5 |
| 6. | Article 5. | Permitted Use. | Page 5, 6 |
| 7. | Article 6. | Operating Costs | Page 6, 7, 8 |
| 8. | Article 7. | Tenant's Proportionate Share; Additions to and Exclusions from the Development | Page 8 |
| 9. | Article 8. | Repairs and Maintenance | Page 8, 9, 10 |
| 10. | Article 9. | Alterations | Page 10 |
| 11. | Article 10. | Signs | Page 10, 11 |
| 12. | Article 11. | Inspections | Page 11 |
| 13. | Article 12. | Utilities | Page 11 |
| 14. | Article 13. | Assignment and Subletting | Page 11, 12, 13 |
| 15. | Article 14. | Insurance; Fire and Casualty Damage | Page 13, 14, 15 |
| 16. | Article 15. | Liability | Page 15 |
| 17. | Article 16. | Eminent Domain | Page 15, 16 |
| 18. | Article 17. | Holding Over | Page 17 |
| 19. | Article 18. | Quiet Enjoyment | Page 17 |
| 20. | Article 19. | Events of Default; Remedies | Page 17, 18, 19 |
| 21. | Article 20. | Rights Reserved to Landlord | Page 19, 20 |
| 22. | Article 21. | Corporate Authority | Page 20 |
| 23. | Article 22. | Relocation of Premises | Page 20 |
| 24. | Article 23. | Landlord's Lien | Page 20 |
| 25. | Article 24. | Subordination | Page 20, 21 |
| 26. | Article 25. | Mechanics' and Other Liens | Page 21 |
| 27. | Article 26. | Notices | Page 21, 22 |
| 28. | Article 27. | Common Areas | Page 22 |
| 29. | Article 28. | Estoppel Certificate | Page 22 |
| 30. | Article 29. | Miscellaneous | Page 22, 23, 24 |
| 31. | Article 30. | Riders; Exhibits | Page 24 |
| 32. | Article 31. | Vacation | Page 24 |
| 33. | Article 32. | Building Services Equipment | Page 24 |
| 34. | Article 33. | Rules and Regulations | Page 25 |
| 35. | Article 34. | Waiver of Jury Trial | Page 25 |
| 36. | Exhibit A | Legal Description | Page 26 |
| 37. | Exhibit B | Site Plan | Page 27 |
| 38. | Exhibit C | Space Plan | Page 28 |
| 39. | Exhibit D | Leased Equipment | Pages 29, 30 |
| 40. | Exhibit E | Tenant Estoppel Statement | Page 31, 32 |
| 41. | Exhibit F | Rules and Regulations | Page 33, 34, 35, 36 |
| 42. | Exhibit G | Renewal Option | Page 37,38,39,40, 41 |
| 43. | Exhibit H | Right of First Offer | |
| 44. | Exhibit I | Landlord Lien Waiver | |

EXHIBIT A



RADICE CORPORATE CENTER III


PRGI, INC.

ONLINE EDUCATION VENTURES, LLC

CAREHQ, INC.  3RX CONSULTING, LLC

LAW FIRM HEADQUARTERS, LLC

EXCELIUM MANAGEMENT, LLC

Tenant

BASIC LEASE INFORMATION RIDER

RADICE CORPORATE CENTER III

STANDARD OFFICE LEASE

| | | |
|---|---|---|
| 1. | Date of Lease: | _____ (for identification purposes only). |
| 2. | Landlord: | RADICE III, LLC. |

| | | |
|---|---|---|
| | Tenant: | PRGI, Inc. a Florida corporation |
| | | Online Education Ventures, LLC a Florida limited liability company |
| | | CareHQ, Inc. a Delaware corporation |
| | | 3Rx Consulting, LLC a Florida limited liability company |
| | | Law Firm Headquarters, LLC  a Nevada limited liability company |
| | | Excelium Management, LLC a Florida limited liability company |

3.  Premises:  Suite 500 & Suite 600, as shown on Exhibit "C-1" & Exhibit "C-2", of Radice Corporate Center III, 1000 Corporate Drive, Fort Lauderdale, Florida 33334 (Radice Corporate Center III together with the parking facilities, landscaped areas and other common areas servicing same are collectively referred to as the "Building").

4.  Rentable Area of Premises: 40,412 rentable square feet. The parties hereby agree that the Premises contain the Rentable Area set forth herein in accordance with the methods of calculating areas and volumes of buildings, as promulgated by BOMA standards.  Landlord and Tenant acknowledge and accept the square footage as set forth in the Lease and neither Landlord nor Tenant shall have the right to demand remeasurement or recalculation of the Rentable Square Feet amounts within the Building or the Premises. .

5.  Commencement Date: January 1, 2015.

6.  Expiration Date: June 30, 2020

8.  Lease Term: sixty six (66) full months.  If the Commencement Date is other than the first day of the month, the Lease Term shall also include the period commencing on the Rent Commencement Date and ending on the last day of any such first partial month.

9.  Base Rent: The Base Rent as per article 3.01 of the Lease will be as follows:

**Suite 500:**

| Months | | | Base Rent Annual | Base Rent Monthly |
|---|---|---|---|---|
| 1 | to | 3 | $0.00 | $0.00 |
| 4 | to | 12 | $272,781.00 | $22,731.75 |
| 13 | to | 24 | $280,964.43 | $23,413.70 |
| 25 | to | 36 | $289,393.36 | $24,116.11 |
| 37 | to | 48 | $298,075.16 | $24,839.60 |
| 49 | to | 60 | $307,017.42 | $25,584.78 |
| 61 | to | 66 | $316,227.94 | $26,352.33 |

*plus any applicable sales tax

1

SC

Suite 600:

| | Months | | Base Rent Annual | Base Rent Monthly |
|---|---|---|---|---|
| 1 | to | 11 | $0.00 | $0.00 |
| 12 | to | 12 | $272,781.00 | $22,731.75 |
| 13 | to | 24 | $280,964.43 | $23,413.70 |
| 25 | to | 36 | $289,393.36 | $24,116.11 |
| 37 | to | 48 | $298,075.16 | $24,839.60 |
| 49 | to | 60 | $307,017.42 | $25,584.78 |
| 61 | to | 66 | $316,227.94 | $26,352.33 |

*plus any applicable sales tax

10.      Tenant's Proportionate Share: 30.30% per article 8.01 of the Lease.

11.      Security Deposit: $1,200,000 in the form of Financial Guarantee Bond per Article 3.0e below:

         $800,000.00 Financial Guarantee Bond due upon Lease execution
         $400,000.00 Financial Guarantee Bond due July 1, 2015

12.      Use of Premises: Tenant may use the Premises only for general and professional office purposes; and for no other purpose whatsoever.   Use of the Premises shall be for general business, which includes, but is not limited to, office, contact center, the use of conference and computer facilities, employee break room and related facilities, teleconferencing, and other legally permitted use consistent with the characteristics of a first-class office building in Ft. Lauderdale.

13.      Number of Parking Spaces: Four (4) spaces per 1000 RSF throughout the Lease Term of the Lease and any extensions, expansions or renewal periods on a non-reserved basis, located within the Building's surface parking area and six (6) canopy reserved parking spots as identified in Exhibit B pursuant to Article 35 below. The above parking shall be provided by Landlord to Tenant at no charge to Tenant.

14.      Tenant's Address for Notices Prior to Commencement Date:

PRGI, Inc.
Diane Sugimoto, CFO
7777 Davie Rd. Ext. Suite 201A
Hollywood, FL 33024

Tenant's Address for Notices After Commencement Date:

PRGI, Inc.
Diane Sugimoto, CFO
1000 Corporate Drive
Suite 500
Fort Lauderdale, FL 33334

2

Landlord's Address for Notices:

Radice III, LLC
c/o CB Richard Ellis
1000 Corporate Drive
Suite 330
Fort Lauderdale, FL 33334

15. Tenant's Real Estate Broker:  Alex Brown, Cresa South Florida
Landlord's Real Estate Broker: Tyler Harrison, Equistone Partners

16. Guarantor(s):  n/a

17. Certain of the information relating to the Lease, including many of the principal economic terms, are set forth in the foregoing Basic Lease Information Rider (the "BLI Rider"). The BLI Rider and the Lease are, by this reference, hereby incorporated into one another. In the event of any direct conflict between the terms of the BLI Rider and the terms of the Lease, the BLI Rider shall control. Where the Lease simply supplements the BLI Rider and does not conflict directly therewith, the Lease shall control.

IN WITNESS WHEREOF, Landlord and Tenant have signed this BLI Rider as of the day and year set forth opposite their respective signatures herein below.

WITNESSES            TENANT:

**PRGI, Inc.**
a Florida corporation

By: _____

Print Name: _____

Date: _____12/31_____, 2014

**Online Education Ventures, LLC**
a Florida limited liability company

By: _____

Print Name: _____

Date: _____12/31_____, 2014

**CareHQ, Inc.**
a Delaware corporation

By: _____

Print Name: _Diane Sugimoto_

Date: _____12/31_____, 2014

3

**3RX Consulting, LLC**
a Florida limited liability company

By: _Amy Roy-Haeger_

Print Name: _Amy Roy- Haeger_

Date: _12/31_, 2014

---

**Law Firm Headquarters, LLC**
a Nevada limited liability company

By: _Diane Sugimoto_

Print Name: _Diane Sugimoto_

Date: _12/31_, 2014

---

**Excelium Management, LLC**
a Florida limited liability company

By: _Diane Sugimoto_

Print Name: _Diane Sugimoto_

Date: _12/31_, 2014

WITNESSES:

LANDLORD:

**RADICE III, LLC,**
a Florida limited liability company

By: _____

Its: _Manager_

Date: _1/7/1_

Shirley D. Roy

4

## OFFICE LEASE AGREEMENT

**THIS LEASE AGREEMENT,** made and entered into by and between RADICE III, LLC, a Florida limited liability company ("Landlord"), and PRGI, Inc., a Florida corporation, Online Education Ventures, LLC, a Florida limited liability company, CareHQ, Inc. a Delaware corporation, 3RX Consulting, LLC, a Florida limited liability company, Excelium Management, LLC, a Florida limited liability company, (jointly and severally referred to as "Tenant"):

### WITNESSETH:

**ARTICLE 1: PREMISES:**

**1.01 Premises.** In consideration of the obligation of Tenant to pay rent and of the other terms, provisions and covenants hereof, Landlord leases to Tenant and Tenant leases from Landlord those premises (the "Premises") described in the Basic Lease Information Rider (the "BLI Rider") attached to the front of this Lease and incorporated into this Lease by this reference. The real property on which the Building is located is legally described in Exhibit A. The Premises are outlined on the site plan attached as Exhibit B. The Building is part of a development (the "Development") commonly known as Radice Corporate Center, a multi-office building, hotel development located in Broward County, Florida.

**ARTICLE 2: TERM OF LEASE AND COMMENCEMENT**

**2.01 Term of Lease.** The term of this Lease (the "Term" or "Lease Term") is for the period of time set forth in the BLI Rider, commencing on the Commencement Date as set forth in the BLI Rider and ending on the Lease expiration date as set forth in the BLI Rider ("Expiration Date").

**2.02 Commencement Date.** The "Commencement Date" shall be January 1, 2015. If Landlord shall be delayed in completing the Premises as a result of: (a) Tenant's failure to agree to plans and specifications; (b) Tenant's request for materials, finishes or installations other than Landlord's standard; (c) Tenant's changes in plans or specifications; or (d) delay in the performance or completion of any work by a party employed by Tenant, the Commencement Date shall be accelerated by the number of days of such delay.

**2.03 Early Access.** Tenant shall have early access to the Premises from the time the Lease has been fully executed and prior to the Commencement Date ("Early Access Period"). From and after the Early Access Period, Landlord shall provide Tenant with access to the Premises and service elevator(s), at no charge, for purposes of performing any construction work and installing Tenant's fixtures, personal property and equipment ("Tenant's Work"). Notwithstanding the foregoing, Tenant shall not be entitled to use and occupy the Premises other than for the performance of the Tenant Work until the Commencement Date has occurred. Tenant shall perform any Tenant Work in the Premises in accordance with, and subject to the limitations contained in this Section 2.03. Tenant agrees that any such entry into and occupancy of the Premises shall be deemed to be under all of the terms, covenants, conditions and provisions of the Lease, except as to the covenant to pay Rent.

**2.04 Lease Contingent on Landlord's Lender's Approval.** This Lease is contingent upon Landlord's receipt of written approval of the Lease from its Lender. Within sixty (60) days of execution of this Lease (unless due to delays caused by Tenant or Force Majeure), if Landlord does not receive an approval or rejection of the Lease from its Lender within sixty (60) days of execution, then the Lease shall be deemed to be accepted provided that Tenant, upon request by Landlord, on a timely basis and at no expense to Tenant shall render assistance and furnish such information in connection with Landlord obtaining Lender approval of the Lease. Notwithstanding the foregoing, the Tenant may take possession of the Premises prior to Landlord's receipt of Lender's approval. However, in the event Landlord's Lender does not approve this Lease, Landlord may terminate the Lease upon written notice to Tenant and Tenant shall vacate the Premises within sixty (60) days receipt of such written notice and

5



thereafter the Lease shall be deemed null and void and shall have no further force and effect. In the event Landlord does not get Lender approval, Landlord shall reimburse Tenant for fifty percent (50%) of Tenant's third party moving and cabling costs in and out of the Premises, not to exceed $50,000.00.

## ARTICLE 3: BASE RENT, RENT ESCALATION AND SECURITY DEPOSIT

**3.01 Base Rent.** During the Lease Term, Tenant will pay as the base rent for the Premises ("Base Rent") the amounts set forth in the BLI Rider, with same being payable without demand, setoff or deduction, in advance, on or before the first day of each month, in equal monthly installments of the amounts set forth in the BLI Rider plus applicable sales and other such taxes as are now or later enacted. In the event any monthly Base Rent and/or Additional Rent (hereinafter defined) payment is not paid within five (5) days after it is due, Tenant agrees to pay a late charge of five (5%) percent of the amount of the payment due. Tenant further agrees that the late charge imposed is fair and reasonable, complies with all laws, regulations and statutes, and constitutes an agreement between Landlord and Tenant as to the estimated compensation for costs and further agrees that the late charge assessed pursuant to this Lease is not interest, and the late charge assessed does not constitute a lender or borrower/creditor relationship between Landlord and Tenant, and may be treated by Landlord as Additional Rent owed by Tenant. The Base Rent and Additional Rent for the first (1st) month of the Lease Term is due at the time Tenant executes this Lease.

**3.02 Security Deposit.** Tenant agrees to deposit with Landlord on the date hereof a security deposit in the amount set forth in the BLI Rider, which sum shall be held by Landlord, without obligation for interest, as security for the full, timely and faithful performance of Tenant's covenants and obligations under this Lease, it being expressly agreed that such deposit is not an advance rental deposit or a measure of Landlord's damages. Upon the occurrence of any event of default by Tenant, Landlord may, from time to time, without prejudice to any other remedy, use such funds to the extent necessary to make good any arrears of Tenant's rent or other payments due Landlord hereunder, and any other damage, injury, expense or liability caused by Tenant's default; and Tenant shall pay to Landlord on demand the amount so applied in order to restore the security deposit to its original amount. Although the security deposit shall be deemed the property of Landlord, any remaining balance of such deposit shall be returned by Landlord within thirty (30) days after termination of this Lease when Landlord shall have determined that all Tenant's obligations under this Lease have been fulfilled. Subject to the other terms and conditions contained in this Lease, if the Premises are conveyed by Landlord, said deposit may be turned over to Landlord's grantee, and if so, Tenant hereby releases Landlord from any and all liability with respect to said deposit and its application or return. In no event is the security deposit to be returned until Tenant has vacated the Premises and delivered possession to Landlord. Landlord shall not be obligated to hold the security deposit in a separate fund, but may mix the security deposit with other funds of the Landlord.

**3.03** In lieu of a Security Deposit, Tenant shall deliver to Landlord two Financial Guarantee Bonds ("Guarantee Bonds") in the amounts of $800,000.00 (due upon Lease execution) and $400,000.00 (due on July 15, 2015) (the "Minimum Amounts"). All Guarantee Bonds required by this Section shall:

    (i)    make Landlord the Obligee.

    (ii)    be issued in a form and substance acceptable to Landlord by National Grange Mutual Insurance Company as Surety.

    (iii)    be issued in the Minimum Amounts.

    (iv)    be freely transferable without fee to Landlord or approval of the issuer, and Tenant shall: (a) cooperate with Landlord in obtaining an amendment or replacement of the Obligee to reflect any such change in Obligee; and (b) pay the cost thereof to the extent the issuer charges for such change in the Obligee.

    (v)    be enforceable from the Lease Commencement Date until a date which is at least thirty

6



(30) days after the scheduled expiration date of the Term of this Lease (as same may be renewed). In the event the Tenant or the Surety provides notice to cancel either or both of the Guarantee Bonds, Tenant and Surety shall be required to deliver notice to Landlord not less than thirty (30) days prior to the proposed cancellation date. In the event Tenant does not deliver to Landlord a new Guarantee Bond(s) on or before the date which is twenty (20) days prior to the cancellation date of the Guarantee Bond(s) then being held by Landlord, then Landlord may (without prejudicing any other right or remedy available to Landlord) claim the entire obligation under the Guarantee Bonds due and owing forthwith.

      (vi)    Tenant agrees that upon any default by Tenant under the terms and provisions of this Lease, Landlord shall have the right, without giving any further notice to Tenant, to make claim on the Guarantee Bond and upon making such claim Landlord shall receive payment of the entire amount of such Guarantee Bonds and any such amounts received by Landlord shall be held by Landlord (and need not be segregated or accrue interest unless otherwise required by Law) and applied in accordance with this Lease in the same manner as a Security Deposit. In the event of a draw of the full amount of the Guarantee Bonds, Tenant shall also pay to Landlord (within five (5) Business Days after Landlord's demand therefor) an amount sufficient so that the proceeds held by Landlord are not less than the Minimum Amount.

In addition to the foregoing, in the event of a termination of this Lease based upon the default of Tenant, or a rejection of this Lease pursuant to the provisions of the Federal Bankruptcy Code, Landlord shall have the right to payment by the Surety in the full amount of the Guarantee Bonds to cover the full amount of damages and other amounts due from Tenant to Landlord under this Lease. Any amounts so paid, at Landlord's election, be applied first to any unpaid rent and other charges which were due prior to the filing of the petition for protection under the Federal Bankruptcy Code. Tenant hereby covenants and agrees not to oppose, contest or otherwise interfere with any attempt by Landlord to obtain payment by the Surety including, without limitation, by commencing an action seeking to enjoin or restrain Landlord from making such claim and/ or receiving payment . TENANT ALSO HEREBY EXPRESSLY WAIVES ANY RIGHT OR CLAIM IT MAY HAVE TO SEEK SUCH EQUITABLE RELIEF. In addition to whatever other rights and remedies Landlord may have against Tenant if Tenant breaches its obligations under this paragraph, Tenant hereby acknowledges that it shall be liable for any and all damages which Landlord may suffer as a result of such breach (including without limitation recovery of Landlord's reasonable attorneys' fees and court costs).

      **3.05 Disclosure of Financial Information.** No more than once a year, and within thirty (30) days of Tenant's completion of Tenant's audited financial statements, but not later than one hundred fifty (150) days after the conclusion of each fiscal year during the term of the Lease, Tenant shall deliver to Landlord Tenant's audited financial statements in accordance with Section 3.05 above. Landlord must keep all such financial statements confidential and not disclose to any third-parties, except Landlord may disclose such financial statements: (1) to Landlord's Mortgagee or prospective mortgagees or purchasers of the Building but such parties must agree in writing to keep such information confidential; (2) in litigation between Landlord and Tenant; and (3) if required by court order.

      **3.06 Rent Abatement.** Provided Tenant has not been in Default under the Lease beyond any applicable cure periods, Base Rent and Operating Costs for Suite 600 shall be conditionally abated during the first eleven (11) months of the Term and Base Rent and Operating Costs for Suite 500 shall be conditionally abated for months one through three (1-3) of the Lease Term. Any increases in Base Rent set forth in the Lease shall occur on the dates scheduled. The abatement of Base Rent and Operating Costs provided for in this Section is conditioned upon Tenant's full and timely performance of all of its obligations under the Lease. If at any time during the Term an Event of Default by Tenant occurs beyond the applicable cure period, then the abatement of Base Rent and Operating Costs provided for in this Section shall immediately become void, and Tenant shall promptly pay to Landlord, in addition to all other amounts due to Landlord under this Lease, the full amount of all future Base Rent and Operating Costs herein abated.

## ARTICLE 4: CONSTRUCTION OF PREMISES

4.01 The space plan of the Premises is attached as Exhibit "C-1" and Exhibit "C-2". Tenant hereby acknowledges and agrees that it accepts the Premises in "As-Is" condition with the exception of Landlord to have the carpet in Suite 500 steam cleaned. Tenant acknowledges that no representations as to the repair of the Premises have been made by Landlord, unless such are expressly set forth in this Lease.

## ARTICLE 5:  PERMITTED USE.

5.01 **Permitted Use.** Tenant shall use and occupy the Premises for those purposes described in Paragraph 18 of the BLI Rider and for no other use or purpose. Tenant shall not do or permit anything to be done in or about the Premises which will in any way obstruct or interfere with the rights of other tenants or occupants of the Building or injure or annoy them, nor use or allow the Premises to be used for any improper, immoral, unlawful, or reasonably objectionable purposes or for any business, use or purpose deemed to be disreputable or inconsistent with the operation of a first class office building, nor shall Tenant cause or maintain or permit any nuisance in, on, or about the Premises. Tenant shall not commit or suffer the commission of any waste in, on, or about the Premises.  Use of the Premises shall be for general business, which includes, but is not limited to, office, contact center, the use of conference and computer facilities, employee break room and related facilities, teleconferencing, and other legally permitted use consistent with the characteristics of a first-class office building in Ft. Lauderdale.   To prevent overload of the Building's structure, system and parking facilities, the population density within the Premises as a whole shall not exceed 180 persons; provided, however, Landlord agrees and acknowledges that Tenant may have up to 220 persons in the Premises for certain limited time periods. Notwithstanding the preceding line If Landlord determines that Tenant's population density in the Premises is overloading the Building's structure, system or parking facilities, Landlord shall provide Tenant with written notice and give Tenant at least thirty (30) days to cure the situation before taking any additional action in accordance with 35.02 below, but in no event shall Landlord be obligated to provide such notice with (30) days to cure more than once every other calendar year (once every 2 calendar years).

5.02 **Compliance with Governmental Laws and Landlord's Regulations.** Tenant shall obtain any and all licenses and permits necessary for any permitted use, comply with all governmental laws, ordinances and regulations applicable to the Premises, and shall promptly comply with all governmental orders and directives for the correction, prevention and abatement of any violations or nuisances in or upon, or connected with, the Premises, all at Tenant's sole expense., If, as a result of any change in the governmental laws, ordinances or regulations, the Premises must be altered to lawfully accommodate the use and occupancy thereof, such alterations shall be made only with the consent of Landlord, but the entire cost thereof shall be borne by Tenant; provided that the necessity of Landlord's consent shall in no way create any liability against Landlord for failure of Tenant to comply with such laws, ordinances or regulations.

5.03 **Compliance with Fire Prevention Code.** Landlord shall deliver the Premises in a state which is compliant with the current fire code of the local government where the Premises are located. Landlord has provided sprinklers within the Premises as required by the building code of the local government where the Premises are located. Tenant shall take whatever other actions are necessary so that the Premises and Tenant's use thereof complies with future changes in the Fire Prevention Code of the National Fire Protection Association and any other fire prevention laws, ordinances, rules or regulations applicable to the Premises.

## ARTICLE 6: OPERATING COSTS

6.01 **Definition of Operating Costs.** The term "Operating Costs" shall mean all costs and expenses paid or incurred by Landlord or on Landlord's behalf in connection with the ownership, leasing, management, repair, replacement, remodeling, maintenance and operation of the Building and the Development (including, without limitation, the costs of maintaining and repairing parking lots, existing

8



parking structures, and easements, landscaping costs, property management fees, utility and janitorial costs, Radice Corporate Center Association, Inc. (the "Association") fees and assessments and the Building's share of costs of the Development), except the following: (i) costs of alterations of tenants' premises; (ii) amounts expended for repairs, replacements or additions to the Building or the Property which would be considered capital in nature according to generally accepted accounting principles; (iii) costs of curing construction defects; (iv) depreciation and other non-cash expenses; (v) interest and principal payments on mortgages, and other debt costs; (vi) real estate brokers' leasing commissions or compensation; (vii) any cost or expenditure for which Landlord is reimbursed, whether by insurance proceeds or otherwise; and (viii) cost of any service furnished to any other occupant of the Building which Landlord does not provide to Tenant hereunder.

**6.02  Taxes:** Landlord shall pay all taxes applicable to the Building and Landlord's pro-rata share of the Development taxes as required by the Association which are payable during the Lease Term. As used herein, the term "taxes" shall mean real estate taxes, assessments (whether general or special), sewer rents, rates and charges, transit and transit district taxes, taxes based upon the receipt of Base Rent or other payments hereunder, and any other federal, state or local governmental charge, general, special, ordinary or extraordinary (but not including income or franchise taxes or any other taxes imposed upon or measured by Landlord's income or profits, except as provided herein), which may now or hereafter be levied, assessed or imposed against the Building, Landlord's pro-rata share of the Development or Premises ("Taxes"). Additionally, Landlord shall have no obligation to protest Taxes, but if Landlord does protest Taxes, the cost of such protest shall also be deemed Taxes. If at any time during the Term of this Lease, the present method of taxation shall be changed so that in lieu of the whole or any part of any taxes, assessments or governmental charges levied, assessed or imposed on real estate and the improvements thereon, there shall be levied, assessed or imposed on Landlord a capital levy or other tax directly on the rents received therefrom and/or a franchise tax, assessment, levy or charge measured by or based, in whole or in part, upon such rents for the present or any future building or buildings on the premises, then all such taxes, assessments, levies or charges, or the part thereof so measured or based, shall be deemed to be included within the term "taxes" for the purposes hereof.

**6.03  Insurance:** Landlord shall provide insurance for the Building as set forth in Article 15.01(a).

**6.04  Other Operating Costs:** Landlord shall provide for the following as they relate to the Building and the Premises: (1) trash removal; (2) landscaping; (3) property management; (4) all other labor costs, supply costs and other costs or services of any kind or nature deemed necessary or prudent by Landlord; and (5) the maintenance, repair and/or replacement of the Building and improvements as follows: (a) the roof; (b) all interior and exterior components of the Building and improvements both structural or otherwise; (c) parking lot, (d) sidewalks, alleys and any and all access drives, including the removal of snow and ice therefrom; (e) heating and air conditioning equipment, lines and fixtures; (f) plumbing equipment, lines and fixtures, including but not limited to fire sprinkler and fire control systems (if any); (g) electrical equipment, lines and fixtures; (h) all other utility equipment, lines and fixtures; (i) all ingress-egress doors to the Building; (j) exterior plate glass; (k) elevator equipment, lines and fixtures (if any); and (l) any and all other maintenance, repairs and/or replacements to the Building and improvements deemed necessary or prudent by Landlord during the Lease Term.

**6.05  Utilities:** Landlord shall pay all utility bills incurred including but not limited to water, gas, electricity, fuel, light, heat and power bills, for the Building. In the event Tenant requests and Landlord provides any of the foregoing services or any other services to Tenant at times outside normal working hours (any time other than 8:00 a.m. to 6:00 p.m. Monday through Friday and 8:00 a.m. to 1:00 p.m. Saturday, specifically excluding Sundays and Holidays), then Landlord shall have the right to bill Tenant and Tenant agrees to pay for such additional services. The current rate for overtime HVAC is $50.00 per hour. For purposes of this provision, "Holidays" shall include New Year's Day, Memorial Day, July 4th, Labor Day, Thanksgiving and Christmas. Landlord shall not be liable for any failure to furnish, or for any loss, injury or damage caused by or resulting from any variation, interruption or failure of utility services. Notwithstanding anything to the contrary contained herein, Landlord shall provide Tenant the ability to

9



utilize 240 hours of overtime HVAC hours at no additional charge to be used in the first six months of the Lease (the "HVAC Overtime Credit"). Any HVAC Overtime Credit remaining after the expiration of the last day of the sixth month of the Lease Term shall be deemed waived.

6.06  Notwithstanding anything contained herein to the contrary, depreciation of any capital improvements which are intended to reduce Operating Costs, or are required under any governmental laws, regulations or ordinances which were not applicable to the Building or the Development at the time it was constructed, or are recommended by the N.F.P.A. Life Safety Code, shall be included in Operating Costs. The useful life of any such improvement shall be reasonably determined by Landlord. In addition, interest on the undepreciated cost of any such improvement (at the prevailing construction loan rate available to Landlord on the date the cost of such improvement was incurred) shall also be included in Operating Costs. If Landlord selects the accrual method of accounting rather than the cash accounting method for Operating Costs purposes, Operating Costs shall be deemed to have been paid when such expenses have accrued. Landlord shall have the right at any time and from time to time to elect, which election shall be subject to revocation, to exclude that portion of Operating Costs attributable to any separately assessed part of the Development and any separate building within the Development. During any period that Operating Costs attributable to any separately assessed part of the Development and/or separate building are so excluded from Operating Costs, then for the purposes of calculating Tenant's proportionate share of Operating Costs as provided in Article 8, the denominator shall not include the rentable area of such separately assessed part of the Development and/or such separate building. Landlord may, in a reasonable manner, allocate insurance premiums for so-called "blanket" insurance policies which insure other properties as well as the Development and said allocated amount shall be deemed to be an Operating Cost.

**6.07  Additional Rent.**
(a)  Tenant shall pay to Landlord the estimate for Tenant's Proportionate Share of Operating Costs and Taxes in equal monthly installments at the same time and place as Base Rent is to be paid. Landlord will furnish a statement of the Tenant's Proportionate Share of Operating Costs and Taxes actually incurred by Landlord no later than April 1 of each year during the Lease Term, including the year following the year in which the Lease expires or is otherwise terminated. In the event that Landlord is, for any reason, unable to furnish the statement of the Tenant's Proportionate Share of Operating Costs and actually incurred by Landlord within the time specified above, Landlord will furnish such statement as soon thereafter as practicable with the same force and effect as the statement would have had if delivered within the time specified above. Tenant will pay to Landlord any deficiency as shown by such statement within thirty (30) days of receipt of such statement. Provided Tenant is not in default of this Lease, Landlord will refund to Tenant any excess as shown by such statement within thirty (30) days of the date of the statement. Landlord will keep books and records showing the Operating Costs and Taxes in accordance with generally accepted accounting principles.

(b)  In the event Landlord furnishes any utility or service which is included in Operating Costs to less than ninety-five percent (95%) of the rentable area of the Building because (i) the average occupancy of the Building for the year in question was not equal to or greater than ninety-five percent (95%), (ii) such utility or service is not required by or provided to one or more of the tenants of the Building, or (iii) any tenant occupant is itself obtaining or providing any such utility or services, then Operating Costs for such year shall be adjusted to include all additional costs, expenses and disbursements that Landlord reasonably determines would have been incurred if Landlord had provided such utilities and services to all tenants of the Building, and shall be allocated among the tenants by the Landlord to reflect those costs which would have occurred had the Building been ninety-five percent (95%) occupied during the year in question and such utilities and services provided to all tenants. The intent of this section is to ensure that the reimbursement of Operating Costs is fairly and equitably allocated among the tenants receiving the utilities and services in question.

(c)  To the extent the Building is part of a larger project or development, Landlord shall have the right (but not the obligation) to allocate to the Building an appropriate portion of those Operating Costs which are incurred with respect to the project as a whole. Landlord and Tenant acknowledge that certain

10

SC                        

of the costs of management, operation and maintenance of the Development may be allocated among all of the buildings in the Development using methods of allocation that are considered reasonable and appropriate for the circumstances. Tenant hereby consents to such allocations provided that the determination of such costs and the allocation of all or part thereof to Operating Costs hereunder shall be in accordance with generally accepted accounting principles applied on a consistent basis. By way of example, landscaping costs for a multi-building project shall be allocated on an appropriate basis between all buildings in the project.

(d)  Any and all payments (other than Base Rent) required to be made by Tenant pursuant to this Lease shall be deemed Additional Rent ("Additional Rent").  Landlord shall have the same rights and remedies for said payments as for Base Rent.

**6.08  Tenant's Audit.** Tenant or its representatives, at Tenant's cost, shall have the right after seven (7) days prior written notice to Landlord to examine Landlord's books and records of Operating Costs during normal business hours within twenty (20) days following the furnishing of the statement to Tenant. Unless Tenant takes written exception to any item within thirty (30) days following the furnishing of the statement to Tenant (which Item shall be paid in any event), such statement shall be considered as final and accepted by Tenant. The taking of exception to any item shall not excuse Tenant from the obligation to make timely payment based upon the statement as delivered by Landlord.

## ARTICLE 7:   TENANT'S PROPORTIONATE SHARE; ADDITIONS TO AND EXCLUSIONS FROM THE DEVELOPMENT

### 7.01 Tenant's Proportionate Share.

For each calendar year falling partly or wholly within the Term, Tenant shall pay to Landlord as Additional Rent its proportionate share of Operating Costs and Taxes as calculated on the basis of the ratio set forth in Section 10 of the BLI Rider. Any payment with respect to any partial calendar year in which the Term commences or ends shall be prorated.  Notwithstanding the foregoing, for purposes of calculating the amount payable by Tenant under this Article 7, Operating Costs (with the exception of Uncontrollable Expenses (defined below)) shall not exceed for any calendar year during the Term of this Lease, other than the first calendar year, the amount of Operating Costs for the preceding calendar year plus five percent (5%)* (compounded annually and on a cumulative basis with calendar year 2015 as the base year). The term "Uncontrollable Expenses" means expenses relating to the cost of utilities, insurance, real estate taxes.

## ARTICLE 8: REPAIRS AND MAINTENANCE

**8.01 Tenant's Obligations.**  (a) Tenant shall at its own cost and expense keep and maintain all interior parts of the Premises in good condition, promptly making all necessary repairs and replacements, whether ordinary or extraordinary, with materials and workmanship of the same character, kind and quality as the original, including but not limited to, interior windows, interior glass and plate glass, doors, skylights, any special office entries, interior walls and finish work, floors and floor coverings, and water heaters within the Premises. Tenant as part of its obligation hereunder shall keep the whole of the interior of the Premises in a clean and sanitary condition. Tenant will as far as possible, use reasonable efforts to keep all such parts of the interior of the Premises from deterioration due to ordinary wear and from falling temporarily out of repair, and upon termination of this Lease in any way, Tenant will yield up the Premises to Landlord in good condition and repair, reasonable wear and tear and loss by fire or other casualty covered by insurance to be secured pursuant to Article 15 excepted (but not excepting any damage to glass or loss not reimbursed by insurance because of the existence of a deductible under the appropriate policy).  Tenant shall not damage any demising wall or disturb the integrity and supports provided by any demising wall and shall, at its sole cost and expense, properly repair any damage or injury to any demising wall caused by Tenant or its employees, agents or invitees. Tenant, at its own cost and expense, as Additional Rent, shall pay for the repair of any damage to the Premises, the Building, or the Development resulting from and/or caused in whole or in part by the negligence or misconduct of

11

Tenant, its agents, servants, employees, patrons, customers, or any other person entering upon the Development as a result of Tenant's business activities or caused by Tenant's default hereunder.

**8.02 Landlord's Obligations.**   (a) Landlord shall maintain the public and common areas of the Building, including lobbies, stairs, elevators, corridors and restrooms, the exterior windows in the Building, the mechanical, plumbing and electrical equipment serving the Building, and the entire exterior structure of the Building, including the roof, in reasonably good order and condition except for damage occasioned by the act of Tenant, which damage shall be repaired by Landlord at Tenant's expense. In the event Tenant requires or needs to have one or more separate systems of either heating, ventilating, air conditioning or other similar systems over and above that provided by Landlord, the cost of installation, care, operation, maintenance and repair thereof shall be borne by and paid for by Tenant.

(b) Provided Tenant is not in default and subject to the provisions elsewhere herein contained and to the rules and regulations of the Building, Landlord agrees to furnish to the Premises weekdays, exclusive of legal holidays, from 8:00 a.m. to 6:00 p.m. and Saturdays, from 9:00 a.m. to 1:00 p.m., heat and air conditioning required in Landlord's judgment for the comfortable use and occupation of the Premises and elevator service; electricity for general office purposes; water for lavatory and drinking at those points of supply provided for general use of tenants; and janitorial services during the times and in the manner that such services are, in Landlord's judgment, customarily furnished in comparable office buildings in the immediate market area.

(c) Landlord shall be under no obligation to provide additional or after-hours heating or air conditioning, but if Landlord elects to provide such services at Tenant's request, Tenant shall pay Landlord a reasonable charge for such services as determined from time to time by Landlord. Tenant agrees to keep closed all window coverings, if any, when necessary because of the sun's position, and Tenant also agrees at all times to cooperate fully with Landlord and to abide by all the regulations and requirements which Landlord may prescribe for the proper functioning and protection of said heating, ventilating, and air conditioning system and to comply with all laws, ordinances and regulations respecting the conservation of energy. Wherever heat-generating machines, excess lighting or equipment are used in the Premises which affect the temperature otherwise maintained by the air conditioning system, Landlord reserves the right to install supplementary air conditioning units for the Premises, and the cost thereof, including the cost of electricity and/or water therefore and the cost of all repairs, maintenance and replacements thereto shall be paid by Tenant to Landlord upon demand.

(d) Tenant will not without the written consent of Landlord use any apparatus or device in the Premises which will in any way increase the amount of electricity or water which Landlord determines to be reasonable for use of the Premises as general office space; nor connect with electrical current, except through existing electrical outlets in the Premises, or with water pipes, any apparatus or device. If Tenant shall require water, electric current or any other resource in excess of that usually furnished, Tenant shall first procure the consent of Landlord, which Landlord may refuse, and Landlord may cause a special meter to be installed in the Premises so as to measure the amount of water, electric current or other resource consumed. The cost of any such meter and of installation, operation, maintenance, and repair thereof shall be paid for by Tenant, and Tenant agrees to pay Landlord promptly upon demand by Landlord for all such water, electric current or other resource consumed, as shown by said meter, at the rates charged by the local public utility furnishing the same, plus any additional expense incurred in keeping account of the water, electric current or other resource so consumed.

(e) Interruptions of any service shall not be deemed an eviction or disturbance of Tenant's use and possession of the Premises, or render Landlord liable for damages by abatement of Base Rent or otherwise or relieve Tenant from performance of Tenant's obligations under this Lease, except as set forth below. Should any equipment or machinery furnished by Landlord cease to function properly, Landlord shall use reasonable diligence to repair the same. Similarly, the curtailment, rationing or restriction on use of water, gas, electricity or any resource, service or utility shall not affect Tenant's obligations hereunder and Landlord may cooperate in a reasonable manner with the efforts of national, state or local governmental agencies or utilities in reducing energy or other resource consumption. Notwithstanding the



foregoing, if: (i) such utility service is interrupted because of the acts of Landlord, its employees, agents or contractors; (ii) Tenant notifies Landlord of such interruption in writing (the "**Interruption Notice**"); (iii) such interruption does not arise in whole or in part as a result of an act or omission of a Tenant Party; (iv) such interruption is not caused by a fire or other casualty; (v) the repair or restoration of such service is reasonably within the control of Landlord; and (vi) as a result of such interruption, the Premises or a material portion thereof, is rendered untenantable (meaning that Tenant is unable to use the Premises in the normal course of it business) and Tenant in fact ceases to use the Premises, or material portion thereof, then, Tenant's sole remedy for such interruption shall be as follows:   on the third (3rd) consecutive business day following the later to occur of the date the Premises (or material portion thereof) becomes untenantable, the date Tenant ceases to use such space and the date Tenant provides Landlord with an Interruption Notice, the Rent payable hereunder shall be abated on a per diem basis for each day after such three (3) business day period based upon the percentage of the Premises so rendered untenantable and not used by Tenant, and such abatement shall continue until the date the Premises become tenantable again.

**8.03   Charges.** Except as otherwise provided elsewhere in this Lease, the sums payable under Section 8.02 shall be considered Additional Rent and may be added to any installment of Base Rent thereafter becoming due, and Landlord shall have the same remedies for default in payment of such sums as for a default in the payment of Base Rent.

**8.04   Janitorial Services.** Tenant shall not provide any janitorial services without Landlord's written consent, which may be withheld in Landlord's sole discretion, and then only subject to supervision of Landlord and by a janitorial contractor or employees at all times satisfactory to Landlord. Any such services provided by Tenant shall be Tenant's sole risk and responsibility.

**8.05   Notice to Landlord to Repair:** In the event Tenant discovers the necessity for Landlord to repair any part of the Premises, Building or Development, which Landlord is obligated to repair and maintain hereunder, Tenant shall provide Landlord with written notice specifically describing the repair or maintenance required. Landlord shall have thirty (30) days to repair the Premises, Building or Development if such repairs can be reasonably accomplished in said time period and Landlord shall diligently pursue cure. In no event shall Tenant be permitted to withhold Base Rent or Additional Rent as a consequence of Landlord's failure to maintain or repair the Premises, Building or Development.

## ARTICLE 9: ALTERATIONS

**9.01   Alterations.** Tenant shall not make any alterations, additions or improvements to the Premises (including, without limitation, the roof and wall penetrations) above One Thousand Five Hundred Dollars ($1,500.00), without the prior written consent of Landlord, which consent may in Landlord's sole discretion be withheld. Each request shall be accompanied by plans detailing the proposed alteration, addition or improvement. In connection with any request for an approval of alterations by Tenant, Landlord may retain the services of an architect and/or engineer, and Tenant shall reimburse Landlord for the reasonable fees of such architect and/or engineer. If Landlord shall, in its sole discretion, consent to any alterations, additions or improvements proposed by Tenant, Tenant shall construct the same in accordance with all governmental laws, ordinances, rules and regulations using a contractor acceptable to Landlord and shall, prior to construction, provide such assurances to Landlord, (including but not limited to, waivers of lien, surety company performance bonds and personal guaranties of individuals of substance) as Landlord shall require to protect Landlord against any loss from any mechanics', laborers' or materialmen's liens or other liens. At the time of completion of each alteration, addition or improvement, Tenant shall deliver to Landlord a set of final "as-built" plans showing such completed alteration, addition or improvement. All alterations, additions, improvements and partitions erected by Tenant shall be and remain the property of Tenant during the Term and Tenant shall, unless Landlord otherwise elects as hereinafter provided, remove all alterations, additions, improvements and partitions erected by Tenant and restore the Premises to their original condition by the date of termination of this Lease or upon earlier vacating of the Premises; provided, however, that if at the time of termination Landlord so elects, such alterations, additions, improvements and partitions shall become the

13

property of Landlord as of the date of termination of this Lease or upon earlier vacating of the Premises and title shall pass to Landlord under this Lease as by a bill of sale. All such removals and restoration shall be accomplished in a good and workmanlike manner so as not to damage the primary structure or structural quality of the Building.

## ARTICLE 10: SIGNS

**10.01 Signs.** No sign, placard, picture, name, advertisement or notice visible from the exterior of the Premises shall be inscribed, painted, affixed, installed or otherwise displayed by Tenant either on its Premises or any part of the Building without the prior written consent of Landlord, and Landlord shall have the right to remove any such sign, placard, picture, name, advertisement, or notice without notice to and at the expense of Tenant. All approved signs or lettering on doors and walls shall be printed, painted, affixed and inscribed at the expense of the Tenant by a person approved by Landlord, Landlord may from time to time maintain any signs at Tenant's expense. Notwithstanding the foregoing, Tenant will be permitted to install, at Tenant's expense, one sign located outside the principal entry of the Premises and one additional sign on the adjacent wall, subject to design review and approval by Landlord. The signs shall conform to the Building standards and must be approved in advance of installation by Landlord, in writing, which approval shall not be unreasonably withheld. Landlord shall provide to Tenant, without charge, a space in the office building directory in the Building lobby.

**10.02 Exterior Signage.** Provided Tenant has not been in default under the lease beyond and applicable cure periods, Landlord will allow Tenant to place building signage with the company name of Excelium on the South side of the Building subject to approval from Landlord. Tenant shall be responsible to remove its building signage within thirty (30) days of the expiration of the Lease. Tenant shall be responsible for obtaining all required permits and for all costs associated with permitting and the installation of Tenant's sign. Landlord shall cooperate with Tenant to obtain the permits for such signage. Tenant acknowledges that any such signage is subject to the receipt of permits from the appropriate governmental authorities which may be beyond the Landlord's control. Landlord makes no representation that such signage can be obtained.

## ARTICLE 11: INSPECTIONS

**11.01 Inspections.** Landlord and Landlord's agents and representatives shall have the right to enter and inspect the Premises at any reasonable time and with reasonable notice, for the following purposes; (a) to ascertain the condition of the Premises; (b) to determine whether Tenant is diligently fulfilling Tenant's responsibilities under this Lease; (c) to supply any service to be provided by Landlord to Tenant hereunder; (d) to make such repairs as may be required or permitted to be made by Landlord under the terms of this Lease (and may for that purpose, without abatement of Base Rent, erect, use and maintain scaffolding, pipes, conduits, and other necessary structures in, through or on the outside of the Building and Premises where reasonably required by the character of the work to be performed, provided entrance to the Premises shall not be blocked thereby, and further provided that the business of Tenant shall not be interfered with unreasonably); (e) to show the Premises to prospective purchasers or mortgagees; and (f) to do any other act or thing which Landlord and Tenant deem reasonable to preserve the Premises and the Building. In the event that Landlord requires access to any under-floor duct, Landlord's liability for carpet (or other floor covering) replacement shall be limited to replacement of the piece removed. During the period that is six (6) months prior to the end of the Term and at any time Tenant is in default hereunder and such default has remained uncured for at least thirty (30) days, Landlord and Landlord's agents and representatives shall have the right to enter the Premises at any reasonable time during business hours for the purpose of showing the Premises. Tenant shall give written notice to Landlord at least thirty (30) days prior to vacating the Premises and shall arrange to meet with Landlord for a joint inspection of the Premises prior to vacating. In the event of Tenant's failure to give such notice or arrange such joint inspection, Landlord's inspection at or after Tenant's vacating the Premises shall be conclusively deemed correct for purposes of determining Tenant's responsibility for repairs and restoration. Notwithstanding the foregoing, in the event of an emergency, as determined by Landlord, no notice is required.

14



## ARTICLE 12: UTILITIES

**12.01 Utilities.** Tenant shall pay for all telephone, electric and other utilities and services used on or from the Premises not supplied by Landlord, together with any taxes, penalties and surcharges or the like pertaining thereto and any maintenance charges for such utilities. Landlord shall furnish and install all electric light bulbs, tubes and ballasts, other than those originally provided to the Premises by Landlord. Subject to the provision set forth in Section 8.02(e) above, Landlord shall not be liable for any interruption or failure of such utility service, nor shall any such interruption or impairment constitute a breach by Landlord of the terms or conditions of this Lease, nor shall any such interruption constitute a ground for abatement of any sums payable by Tenant hereunder,.

## ARTICLE 13: ASSIGNMENT AND SUBLETTING

**13.01 Assignment and Subletting.** Notwithstanding 13.02, (a) Tenant shall not have the right to assign or pledge this Lease or to sublet the whole or any part of the Premises, whether voluntarily or by operation of law, or permit the use or occupancy of the Premises by anyone other than Tenant, without the prior written consent of Landlord which consent may in Landlord's sole discretion be withheld, and such restrictions shall be binding upon any assignee or subtenant to which Landlord has consented. In the event Tenant desires to sublet the Premises, or any portion thereof, or assign this Lease, Tenant shall give written notice thereof to Landlord within a reasonable time prior to the proposed commencement date of such subletting or assignment, which notice shall set forth the name of the proposed subtenant or assignee, the relevant terms of any sublease and copies of financial reports and other relevant financial information of the proposed subtenant or assignee. In no event may Tenant sublet, nor will Landlord consent to any sublease of, all or any portion of the Premises if the rent is determined in whole or in part based upon the income or profits derived by the sublessee (other than a rent based upon a fixed percentage or percentages of receipts or sales). Notwithstanding any permitted assignment or subletting, Tenant shall at all times remain directly, primarily and fully responsible and liable for the payment of the Base Rent and Additional Rent herein specified and for compliance with all of its other obligations under the terms, provisions and covenants of this Lease. Upon the occurrence of an "event of default", as hereinafter defined, if the Premises or any part thereof are then assigned or sublet, Landlord, in addition to any other remedies herein provided, or provided by law, may, at its option, collect directly from such assignee or subtenant all rents due and becoming due to Tenant under such assignment or sublease and apply such rent against any sums due to Landlord from Tenant hereunder, and no such collection shall be construed to constitute a novation or a release of Tenant from the further performance of Tenant's obligations hereunder. Tenant shall pay to Landlord on demand, a reasonable service charge for the processing of the application for the consent and for the preparation of the consent. Such service charge shall be collectible by Landlord only where consent is granted by Landlord. Notwithstanding anything to the contrary contained in this Section, Landlord will not unreasonably withhold its consent to any proposed assignee: (i) whose financial condition as determined by Landlord is greater than or equal to Tenant's, (ii) who will use the Premises for a similar use as Tenant (iii) whose use will not and will not violate any covenant of any other leases in the Building; and (iv) who is not or has not been a prospect for any other space in the Building.

(b) In addition to, but not in limitation of, Landlord's right to approve of any subtenant or assignee, Landlord shall have the option, in its sole discretion, in the event of any proposed subletting or assignment, to terminate this Lease, or in the case of a proposed subletting of less than the entire Premises, to recapture the portion of the Premises to be sublet, as of the date the subletting or assignment is to be effective. The option shall be exercised, if at all, by Landlord giving Tenant written notice thereof within sixty (60) days following Landlord's receipt of Tenant's written notice as required in Section 13.01 (a) above. If this Lease shall be terminated with respect to the entire Premises pursuant to this Section, the Term shall end on the date stated in Tenant's notice as the effective date of the sublease or assignment as if that date had been originally fixed in this Lease for the expiration of the Term; provided, however, that effective on such date Tenant shall pay Landlord all amounts, as estimated by Landlord, payable by Tenant to such date, with respect to taxes, insurance, repairs, maintenance, restoration and other

15

obligations, costs or charges which are the responsibility of Tenant hereunder. Further, upon any such termination Landlord and Tenant shall have no further obligations or liabilities to each other under this Lease, except with respect to obligations or liabilities which accrued hereunder as of such termination date (in the same manner as if such termination date were the date originally fixed in this Lease for the expiration of the Term). If Landlord recaptures under this Section only a portion of the Premises the rent during the unexpired Term shall abate proportionately based on the rent per square foot contained in this Lease as of the date immediately prior to such recapture. Tenant shall at Tenant's own cost and expense, discharge in full any unamortized commission obligation on the part of Landlord with respect to this Lease and any commissions which may be due and owing as a result of any proposed assignment or subletting, whether or not the Premises are recaptured pursuant hereto and rented by Landlord to the proposed tenant or any other tenant. In the event of the recapture of a portion of the Premises by Landlord pursuant to the terms of this paragraph, Tenant shall pay all costs associated with the separation of the recaptured Premises from the portion not recaptured, including, but without limitation, the cost of all demising partitions, changes in lighting and HVAC distribution systems and all reasonable architectural and/or engineering fees.

(c) Any assignment or subletting by Tenant pursuant to Section 13.01 (a) of all or any portion of the Premises, shall automatically operate to terminate each and every special right, option, or election, if any exist, belonging to Tenant (i.e. ones not contained in Landlord's printed lease form), including by way of illustration, but not limitation, any option to expand its Premises or to extend or renew the Term for all or any portion of the Premises i.e., such rights and options shall cease both as to space sublet or assigned and as to any portion of the original Premises retained by Tenant.

**13.02 Corporate Transactions.** (a) Notwithstanding the provisions of Section 13.01, Tenant may, without Landlord's consent, assign this Lease to any corporation succeeding to substantially all the business and assets of Tenant by merger, consolidation, purchase of assets or otherwise or to any corporation or entity which is a parent, subsidiary or division of Tenant, provided that the following conditions are satisfied: (i) the total assets and net worth of such assignee shall be equal to or more than that of Tenant immediately prior to the Commencement Date; (ii) Tenant is not then in default hereunder; and (iii) such successor shall execute and deliver to Landlord an instrument in writing fully assuming all the obligations and liabilities imposed upon Tenant hereunder. Upon satisfaction of the foregoing, Landlord agrees to discharge Tenant from any further liability hereunder.

(b) If Tenant is a corporation, the shares of which at the time of execution of this Lease are held by fewer than fifty (50) persons, and if at any time during the Term persons, firms or corporations who own at least fifty one percent (51%) of its shares at the time of the execution of this Lease, or following Landlord's consent to a transfer of such shares cease to own such shares (other than as a result of transfer by bequest or inheritance) and such transfer shall not first have been approved in writing by Landlord, such transfer shall, at the option of Landlord be deemed a default by Tenant under this Lease.

## ARTICLE 14: INSURANCE; FIRE AND CASUALTY DAMAGE

**14.01 Landlord's Insurance.** (a) Landlord shall maintain all insurance policies deemed by Landlord to be reasonably necessary or desirable and relating in any manner to the protection, preservation or operation of the Development including, but not limited to, standard fire and extended coverage insurance covering the Building in an amount not less than eighty (80%) percent (or such greater percentage as may be necessary to comply with the provisions of any co-insurance clauses of the policy) of the replacement cost thereof, insuring against the perils of fire and lighting and including extended coverage, or, at Landlord's option, all risk coverage and, if Landlord so elects, earthquake, flood and wind coverages. Landlord's purchase of insurance on behalf of the Tenant shall be subject to the applicable notice and cure provisions provided herein.

(b) Subject to the provisions of this Article, the insurance to be maintained by Landlord hereunder shall be for the sole benefit of Landlord and under its sole control. Tenant shall not take out separate insurance concurrent in form or contributing in the event of loss with that maintained by Landlord



hereunder unless Landlord is included as an additional insured thereon. Tenant shall immediately notify Landlord whenever any such separate insurance is taken out and shall promptly deliver to Landlord the policy or policies of such insurance.

**14.02 Tenant's Insurance.** Tenant shall procure and maintain throughout the Term a policy or policies of insurance in form and substance satisfactory to Landlord, at Tenant's sole cost and expense, insuring Landlord, Landlord's mortgagee, if any, and Tenant against all claims, demands or actions arising out of or in connection with: (i) the Premises, (ii) the condition of the Premises, (iii) Tenant's operations in and maintenance and use of the Premises and (iv) Tenant's liability assumed under this Lease; the limits of such policy or policies to be in the amount of not less than $1,000,000 per occurrence in respect of injury to persons (including death), and in the amount of not less than $250,000 per occurrence in respect of property damage or destruction, including loss of use thereof. All such policies shall be procured by Tenant from responsible insurance companies satisfactory to Landlord. Certified copies of such policies, together with receipt evidencing payment of premiums therefore shall be delivered to Landlord prior to the Rent Commencement Date. Not less than fifteen ( 15) days prior to the expiration date of any such policies, certified copies of the renewals thereof (bearing notations evidencing the payment of renewal premiums) shall be delivered to Landlord. Such policies shall further provide that not less than thirty (30) days written notice shall be given to Landlord before such policy may be canceled or changed to reduce the insurance coverage provided thereby. In the event Landlord makes a request to Tenant in writing to provide Landlord with proof of Tenant's insurance, and Tenant fails to provide such proof within fifteen (15) days of such request, Tenant shall pay Landlord an administrative fee equal to five percent (5%) of Tenant's monthly Base Rent and Additional Rent, which will be charged to Tenant's next month's Base Rent. Tenant further agrees that the administrative charge imposed is fair and reasonable, complies with all laws, regulations and statutes, and constitutes an agreement between Landlord and Tenant as to the estimated compensation for costs and further agrees that the late charge assessed pursuant to this Lease is not interest, and the late charge assessed does not constitute a lender or borrower/creditor relationship between Landlord and Tenant, and may be treated by Landlord as Additional Rent owed by Tenant.

**14.03 Waiver of Subrogation.** Each of Landlord and Tenant hereby releases the other from any and all liability or responsibility to the other or anyone claiming through or under them by way of subrogation or otherwise for any loss or damage to property caused by fire, extended coverage perils, vandalism or malicious mischief, sprinkler leakage, or any other perils insured in policies of insurance covering such property, even if such loss or damage shall have been caused by the fault or negligence of the other party, or anyone for whom such party may be responsible, including any other tenants or occupants of the remainder of the Development; provided, however, that this release shall be applicable and in force and effect only to the extent that such release shall be lawful at that time and in any event only with respect to loss or damage occurring during such times as the releasor's policies shall contain a clause or endorsement to the effect that any such release shall not adversely affect or impair said policies or prejudice the right of the releasor to recover thereunder and then only to the extent of the insurance proceeds payable under such policies. Each of Landlord and Tenant agrees that it will request its insurance carriers to include in its policies such a clause or endorsement.

**14.04 Damage or Destruction.** (a) If the Building or Premises are rendered partially or wholly uninhabitable by fire or other casualty, and if such damage cannot, in Landlord's reasonable estimation, be materially restored within one hundred eighty (180) days of such damage, then Landlord may, at its sole option, terminate this Lease as of the date of such fire or casualty. Landlord shall exercise its option provided herein by written notice to Tenant within sixty (60) days of such fire or other casualty. For purposes hereof, the Building or Premises shall be deemed "materially restored" if they are in such condition as would not prevent or materially interfere with Tenant's use of the Premises for the purposes described in the BLI Rider.

(b) If this Lease is not terminated by either party pursuant to Section 14.04 (a) above, then Landlord shall proceed with all due diligence to repair and restore the Building or Premises, as the case may be (except that Landlord may elect not to rebuild if such damage occurs during the last year of the

17

Term exclusive of any option which is unexercised at the date of such damage).

(c) If this Lease shall be terminated pursuant to Section 14.04(a), the Term shall end on the date of such damage as if that date had been originally fixed in this Lease for the expiration of the Term. If this Lease shall not be terminated by Landlord or Tenant pursuant to Section 14.04(b), and the Premises is uninhabitable in whole or in part following such damage, the Base Rent and Additional Rent payable during the period in which the Premises is uninhabitable shall be reduced to such extent, if any, as may be fair and reasonable under all of the circumstances. Furthermore, if Landlord shall fail to complete such material restoration within one hundred eighty (180) days after the date of such damage, , Tenant may at its option and as its sole remedy terminate this Lease by delivering written notice to Landlord, whereupon the Lease shall end on the date of such notice as if the date of such notice were the date originally fixed in this Lease for the expiration of the Term; provided, however, that if construction is delayed because of changes, deletions, or additions in construction requested by Tenant, strikes, lockouts, casualties, acts of God, war, material or labor shortages, governmental regulation or control or other causes beyond the reasonable control of Landlord, the period for restoration, repair or rebuilding shall be extended for the amount of time Landlord is so delayed. In no event shall Landlord be required to rebuild, repair or replace any part of the partitions, fixtures, additions or other improvements which may have been placed in or about the Premises by Tenant. To the extent Landlord undertakes to rebuild or repair the Premises or the Building as a result of a casualty as set forth herein, in no event shall Landlord's obligations exceed the amount of insurance proceeds available.

(d) In the event of any damage or destruction to the Building by any peril covered by the provisions of this Article 14, Tenant shall, upon notice from Landlord, forthwith remove, at its sole cost and expense, such portion or all of Tenant's property belonging to Tenant from such portion or allotment of the Premises as Landlord shall request, and Tenant hereby indemnifies and holds harmless the Development, the Building. Landlord, Landlord's agents and employees from any loss, liability, claims, suits, costs, expenses, including attorney's fees and damages, both real and alleged, arising out of any damage or injury as a result of the failure to properly secure the Premises prior to such removal and/or as a result of such removal.

(e) Notwithstanding anything herein to the contrary, in the event of substantial damage to or destruction of the Building, and the holder of any indebtedness secured by a mortgage or deed of trust covering the Premises or the Building requires that the insurance proceeds be applied to such indebtedness, then Landlord shall have the right to terminate this Lease by delivering written notice of termination to Tenant within thirty (30) days after such request is made by any such holder, whereupon the Lease shall end on the date of such damage as if the date of such damage were the date originally fixed in the Lease for the expiration of the Term. Notwithstanding the foregoing, Landlord will notice Tenant within sixty (60) days after the occurrence of such damage or destruction of the estimated time required for the repair or restoration of the Premises or the portion of the Building necessary for Tenant's occupancy. If the estimated time is in excess of the period of one hundred and eighty (180) days after such damage, Tenant may elect within thirty (30) days after Landlord's notice of estimated time as given to terminate this Lease effective on the date of such damage or destruction. If Landlord notices Tenant that repair or restoration shall take less than one hundred eighty (180) days, and in the event Landlord does not complete the repairs and restoration that is necessary for Tenant's occupancy pursuant to the definition of Substantial Completion herein defined (subject to Section 29.10), Tenant may, at its option, cancel this Lease in its entirety with no further obligation to the Landlord.

## ARTICLE 15: LIABILITY

15.01 Liability. Landlord shall not be liable to Tenant or Tenant's employees, agents, patrons or visitors, or to any other person whomsoever, for any injury to person or damage to property on or about the Premises, the Building, or the Development, resulting from and/or caused in part or whole by the negligence or misconduct of Tenant, its agents, servants or employees, invitees, permitees or of any other person entering upon the Premises, the Building, or the Development, or caused by the Premises becoming out of repair, or caused by leakage of gas, oil, water or steam or by electricity emanating from

18



the Premises, or due to any cause whatsoever, and Tenant hereby covenants and agrees that it will at all times indemnity and hold safe and harmless, the Landlord, Landlord's agents and employees from any loss liability, claims, suits, costs and expenses, including attorney's fees and damages, both real and alleged, arising out of any such damage or injury; except injury to persons or damage to property the sole cause of which is the gross negligence of Landlord or the failure of Landlord to repair any part of the Premises which Landlord is obligated to repair and maintain hereunder after proper notice in accordance with Section 8.02 above. Landlord shall have no liability for any loss or damage to Tenant's business or personal property arising out of, but not limited to any of the following causes: hurricanes; excessive rain; roofing defects; bursting pipes; fire; windstorm; malfunction of electrical system, HVAC, sewer or water system; or interruption of utility services; or any act or omission of Landlord or any of Landlord's agents on or about the Premises, Building or Development, unless such act or omission rises to the level of gross negligence.

## ARTICLE 16: EMINENT DOMAIN

**16.01 Eminent Domain.** (a) If the whole or any substantial part of the Premises or Building should be taken for any public or quasi-public use under governmental law, ordinance or regulation, or by right of eminent domain, or by private purchase in lieu thereof and the taking would prevent or materially interfere with the use of the Premises or Building for the purpose for which they are then being used, this Lease shall terminate effective when the legal taking shall occur as if the date of such taking were the date originally fixed in the Lease for the expiration of the Term.

(b) If part of the Building or Premises shall be taken for any public or quasi-public use under governmental law, ordinance or regulation, or by right of eminent domain, or by private purchase in lieu thereof, and this Lease is not terminated as provided above, this Lease shall not terminate but the Base Rent or Additional Rent payable hereunder during the unexpired portion of this Lease shall be reduced to such extent, if any, as may be fair and reasonable and Landlord shall undertake to restore the Premises to a condition suitable for Tenant's use, as near to the condition thereof immediately prior to such taking as is reasonably feasible.

(c) In the event of any such taking or private purchase in lieu thereof, Landlord and Tenant shall each be entitled to receive and retain such separate awards and/or portion of lump sum awards as may be allocated to their respective interests in any condemnation proceedings; provided that Tenant shall not be entitled to receive any award for the loss of any improvements paid for by Landlord or for Tenant's loss of its leasehold interest, the right to such award as to such item being hereby assigned by Tenant to Landlord.

## ARTICLE 17: HOLDING OVER

**17.01 Holding Over.** Tenant will, at the termination of this Lease by lapse of time or otherwise, yield up immediate possession of the Premises to Landlord. If Tenant retains possession of the Premises or any part thereof after such termination, then Landlord may, at its option, serve written notice upon Tenant that such holding over constitutes anyone of: (a) renewal of this Lease for one year and from year to year thereafter, or (b) creation of a month to month tenancy, upon the terms and conditions set forth in this Lease, or (c) creation of a tenancy at sufferance, upon the terms and conditions set forth in this Lease; provided, however, that the monthly Base Rent [or daily rental under clause (c)] shall, in addition to all other sums which are to be paid by Tenant hereunder, whether or not as Additional Rent, be equal to 150% the total rental being paid monthly to Landlord under this Lease immediately prior to such termination [prorated in the case of clause (c) on the basis of a 365-day year for each day Tenant remains in possession]. If no such notice is served, then a tenancy at sufferance shall be deemed to be created at the rent described in the preceding sentence. Tenant shall also pay to Landlord all damages sustained by Landlord resulting from retention of possession by Tenant, including the loss of any proposed subsequent tenant for any portion of the Premises. The provisions of this Section shall not constitute a waiver by Landlord of any right of re-entry as herein set forth; nor shall receipt of any rent or any other act in apparent affirmance of the tenancy operate as a waiver of the right to terminate this Lease for a breach of

19

any of the terms, covenants, or obligations herein on Tenant's part to be performed.

## ARTICLE 18: QUIET ENJOYMENT

**18.01 Quiet Enjoyment.** Landlord represents and warrants that Tenant, upon paying the Base Rent and Additional Rent herein set forth and performing its other covenants and agreements herein set forth, shall peaceably and quietly have, hold and enjoy the Premises for the Term without hindrance or molestation from Landlord, subject to the terms and provisions of this Lease. Landlord agrees to make reasonable efforts to protect Tenant from interference or disturbance by other tenants or third persons; however, Landlord shall not be liable for any such interference or disturbance, nor shall Tenant be released from any of the obligations of this Lease because of such interference or disturbance. In the event this Lease is a sublease, then Tenant agrees to take the Premises subject to the provisions of the prior leases.

## ARTICLE 19: EVENTS OF DEFAULT; REMEDIES

**19.01 Events of Default.** The following events shall be deemed to be events of default by Tenant under this Lease.

(a) Tenant shall fail to pay when or before due any sum of money becoming due to be paid to Landlord hereunder, whether such sum be any installment of the Base Rent herein reserved, any other amount treated as Additional Rent hereunder, or any other payment or reimbursement to Landlord required herein, whether or not treated as Additional Rent hereunder, and such failure shall continue for a period of five (5) days from the date such payment was due and after Tenant receives written notice of such failure to pay. However, in the event Landlord sends two written notices to Tenant for failure to timely pay Base Rent during the Term of this Lease, all further notices for failure to timely pay Base Rent shall contain only a three (3) day grace period and Tenant shall be deemed to be in default after three (3) days written notice;

(b) Tenant shall fail to comply with any term, provision or covenant of this Lease other than by failing to pay when or before due any sum of money becoming due to be paid to Landlord hereunder, and shall not cure such failure within twenty (20) business days (forthwith, if the default involves a hazardous condition) after written notice thereof to Tenant; or

(c) Tenant shall fail to continuously occupy and use the Premises as provided herein, or Tenant shall abandon or vacate any substantial portion of the Premises; or

(d) Tenant shall fail to immediately vacate the Premises upon termination of this Lease, by lapse of time or otherwise or upon termination of Tenant's right to possession only; or

(e) The leasehold interest of Tenant shall be levied upon under execution or be attached by process of law or Tenant shall fail to contest diligently the validity of any lien or claimed lien and give sufficient security to Landlord to insure payment thereof or shall fail to satisfy any judgment rendered thereon and have the same released, and such default shall continue for ten (10) days after written notice thereof to Tenant; or

(f) Tenant shall become insolvent, admit in writing its inability to pay its debts generally as they become due, file a petition in bankruptcy or a petition to take advantage of any insolvency statute, make an assignment for the benefit of creditors, make a transfer in fraud of creditors, apply for or consent to the appointment of a receiver of itself or of the whole or any substantial part of its property, or file a petition or answer seeking reorganization or arrangement under the federal bankruptcy laws, as now in effect or hereafter amended, or any other applicable law or statute of the United States or any state thereof; or

(g) A court of competent jurisdiction shall enter an order, judgment or decree adjudicating Tenant a bankrupt, or appointing a receiver of Tenant, or of the whole or any substantial part of its property,

20





without the consent of Tenant, or approving a petition filed against Tenant seeking reorganization or arrangement of Tenant under the bankruptcy laws of the United States, as now in effect or hereafter amended, or any state thereof, and such order, judgment or decree shall not be vacated or set aside or stayed within thirty (30) days from the date of entry thereof.

**19.02 Remedies.** (a) Upon the occurrence of any of such events of default described in Section 19.01 hereof or elsewhere in this Lease, Landlord shall have the option to pursue anyone or more of the following remedies without any notice or demand whatsoever.

(i) Landlord may, at its election, terminate this Lease or terminate Tenant's right to possession only, without terminating the Lease;

(ii) Upon any termination of this Lease, or upon any termination of Tenant's right to possession without termination of the LeaseTenant shall surrender possession and vacate the Premises immediately, and deliver possession thereof to Landlord, and Tenant hereby grants to Landlord full and free license to enter into and upon the Premises in such event and to remove by process of law Tenant and any others who may be occupying or within the Premises and to remove any and all property therefrom, without being deemed in any manner guilty of trespass, eviction or forcible entry or detainer, and without incurring any liability for any damage resulting therefrom, Tenant hereby waiving any right to claim damage for such re-entry and expulsion, and without relinquishing Landlord's right to rent or any other right given to Landlord hereunder or by operation of law;

(iii) Upon any termination of this Lease, Landlord shall be entitled to recover as damages, all Base Rent, including any amounts treated as Additional Rent hereunder, and other sums due and payable by Tenant on the date of termination, plus the sum of (x) an amount equal to the then present value of the Base Rent, including any amounts treated as Additional Rent hereunder, and other sums provided herein to be paid by Tenant for the residue of the stated Term, less the fair rental value of the Premises for such residue (taking into account the time and expense necessary to obtain a replacement tenant or tenants, including expenses hereinafter described in subsection (iv) relating to recovery of the Premises, preparation for reletting and for reletting itself), and (y) the cost of performing any other covenants which would have otherwise been performed by Tenant

(iv) Landlord, in addition to all rights and remedies provided in the Lease, may declare the entire amount of the present value of the Base Rent which would have become due and payable during the remainder of the Term of this Lease, as adjusted from time to time, to be due and payable immediately, along with the present value of the Additional Rent as defined in this Lease, due for the remainder of the Term of the Lease. The projected Operating Costs due for the remainder of the Lease Term shall be the actual Operating Costs due for the year of the default applied to the remaining Term of the Lease. Tenant agrees to pay the accelerated Base Rent and Additional Rent charges to Landlord at once, it being agreed that such payment shall constitute payment in advance of the Base Rent stipulated for the remainder of the Term. In the event Landlord collects the accelerated Base Rent from Tenant, Tenant shall be credited for amounts received if the premises are relet. Landlord shall use reasonable commercial efforts to relet the Demised Premises in the event of Tenant's default. The acceptance by Landlord of the payment of the accelerated Base Rent shall not constitute a waiver of any default then existing or thereafter occurring hereunder.

(v) In the event Landlord elects to repossess the Premises by eviction proceedings or otherwise, it may do so with or without terminating this Lease, and shall have the option of accelerating the annual Base Rent and Additional Rent charges as set forth herein, in addition to pursuing any of the other remedies set forth in the Lease or permitted by law

(vi) Upon any termination of Tenant's right to possession only without termination of the Lease:

(A) Landlord may, at Landlord's option, enter into the Premises, remove Tenant's signs and other evidences of tenancy, and take and hold possession thereof as provided in subsection (ii) above, without

21




such entry and possession terminating the Lease or releasing Tenant, in whole or in part, from any obligation, including Tenant's obligation to pay the Base Rent, including any amounts treated as Additional Rent, hereunder for the full Term. In any such case Tenant shall pay forthwith to Landlord if Landlord so elects, a sum equal to the entire amount of Base Rent, including any amounts treated as Additional Rent hereunder, for the residue of the stated Term plus any other sums provided herein to be paid by Tenant for the remainder of the Term.

(B) Landlord shall use reasonable commercial efforts to relet the Premises or any part thereof for such rent and upon such terms as Landlord, in its sole discretion, shall determine (including the right to relet the Premises for a greater or lesser term than that remaining under this Lease, the right to relet the Premises as a part of a larger area, and the right to change the character or use made of the Premises). Landlord shall only be required to use the same efforts Landlord then uses to lease other properties Landlord owns or manages (or if the Premises is then managed for Landlord, then Landlord will instruct such manager to use the same efforts such manager then uses to lease other space or properties which it owns or manages); provided, however, that Landlord (or its manager) shall not be required to give any preference or priority to the showing or leasing of the Premises over any other space that Landlord (or its manager) may be leasing or have available and may place a suitable prospective tenant in any such available space regardless of when such alternative space becomes available; provided, further, that Landlord shall not be required to observe any instruction given by Tenant about such reletting or accept any tenant offered by Tenant unless such offered tenant has a creditworthiness acceptable to Landlord, leases the entire Premises, agrees to use the Premises in a manner consistent with the Lease and leases the Premises at the same rent, for no more than the current Term and on the same other terms and conditions as in this Lease without the expenditure by Landlord for tenant improvements or broker's commissions. In any such case, Landlord may, but shall not be required to, make repairs, alterations and additions in or to the Premises and redecorate the same to the extent Landlord deems necessary or desirable, and Tenant shall, upon demand, pay the cost thereof, together with Landlord's expenses of reletting, including, without limitation, any broker's commission incurred by Landlord. If the consideration collected by Landlord upon any such reletting plus any sums previously collected from Tenant are not sufficient to pay the full amount of all Base Rent, including any amounts treated as Additional Rent hereunder and other sums reserved in this Lease for the remaining portion of the Term, together with the costs of repairs, alterations, additions, redecorating, and Landlord's expenses of reletting and the collection of the amounts accruing therefrom (including attorney's fees and broker's commissions), Tenant shall pay to Landlord the amount of such deficiency upon demand and Tenant agrees that Landlord may file suit to recover any sums falling due under this subsection from time to time;

(vii) Any and all property which may be removed from the Premises by Landlord pursuant to the authority of the Lease or of law, to which Tenant is or may be entitled, may be handled, removed and stored, as the case may be, by or at the direction of Landlord at the risk, cost and expense of Tenant, and Landlord shall in no event be responsible for the value, preservation or safekeeping thereof. Tenant shall pay to Landlord, upon demand, any and all expenses incurred in such removal and all storage charges against such property so long as the same shall be in Landlord's possession or under Landlord's control. Any such property of Tenant not retaken by Tenant from storage within thirty (30) days after the removal from the Premises shall conclusively be presumed to have been conveyed by Tenant to Landlord under this Lease as a bill of sale without further payment or credit by Landlord to Tenant.

(viii) In the event Tenant fails to pay any installment of Base Rent, including any amount treated as Additional Rent hereunder, or other sums hereunder as and when such installment or other charge is due, Tenant shall pay to Landlord on demand a late charge in an amount equal to five percent (5%) of such installment or other charge overdue in any month and five percent (5%) each month thereafter until paid in full to help defray the additional cost to Landlord for processing such late payments, and such late charge shall be Additional Rent hereunder and the failure to pay such late charge within ten ( 10) days after demand therefore shall be an additional event of default hereunder. In the event Tenant fails to cure a non-monetary default within the time period set forth in Article 20.01(b) Tenant shall pay to Landlord on demand a late charge of $250.00 per occurrence to help defray the additional cost to Landlord for processing such default. Failure to pay such late charge shall be an additional default hereunder. The

22





provision for such late charge shall be in addition to all of Landlord's other rights and remedies hereunder or at law and shall not be construed as liquidated damages or as limiting Landlord's remedies in any manner.

(ix) Pursuit of any of the foregoing remedies shall not preclude pursuit of any of the other remedies herein provided or any other remedies provided by law (all such remedies being cumulative), nor shall pursuit of any remedy herein provided constitute a forfeiture or waiver of any amounts due to Landlord hereunder or of any damages accruing to Landlord by reason of the violation of any of the terms, provisions and covenants herein contained. No act or thing done by Landlord or its agents during the Term shall be deemed a termination of this Lease or an acceptance of the surrender of the Premises, and no agreement to terminate this Lease or accept a surrender of said Premises shall be valid unless in writing signed by Landlord. No waiver by Landlord of any violation or breach of any of the terms, provisions and covenants herein contained shall be deemed or construed to constitute a waiver of any other violation or breach of any of the terms, provisions and covenants herein contained. Landlord's acceptance of the payment of rental or other payments hereunder after the occurrence of an event of default shall not be construed as a waiver of such default, unless Landlord so notifies Tenant in writing. Forbearance by Landlord to enforce one or more of the remedies herein provided upon an event of default shall not be deemed or construed to constitute a waiver of such default or of Landlord's right to enforce any such remedies with respect to such default or any subsequent default. If, on account of any breach or default by Tenant in Tenant's obligations under the terms and conditions of this Lease, it shall become necessary or appropriate for Landlord to employ or consult with an attorney concerning or to enforce or defend any of Landlord's rights or remedies hereunder, Tenant agrees to pay any attorney's fees so incurred.

## ARTICLE 20: RIGHTS RESERVED TO LANDLORD.

**20.01 Rights Reserved to Landlord.** Landlord reserves and may exercise the following rights without affecting Tenant's obligations hereunder:

(a) To change the name or the street address of the Building or the Development;

(b) To install and maintain a sign or signs on the exterior of the Building;

(c) To designate all sources furnishing sign painting and lettering, ice, drinking water, towels, coffee cart service and toilet supplies, lamps and bulbs used on the Premises;

(d) To retain at all times pass keys to the Premises;

(e) To grant to anyone the exclusive right to conduct any particular business or undertaking in the Building or in the Development;

(f) To close the Building after regular work hours and on legal holiday subject however, to Tenant's right to admittance, under such reasonable regulations as Landlord may prescribe from time to time, which may include by way of example but not of limitation, that persons entering or leaving the Building identify themselves to a watchman by registration or otherwise and that said persons establish their right to enter or leave the Building;

(g) To take any and all measures, including inspections, repairs, alterations, decorations, additions, and improvements to the Premises or the Building, and identification and admittance procedures for access to the Building as may be necessary or desirable for the safety, protection, preservation or security of the Premises or the Building or the Landlord's interest, or as may be necessary or desirable in the operation of the Building; and



23



(h) To change the arrangement and/or location of entrances and corridors in and to the Building and to add, remove or modify buildings, roadways, parking areas, walkways, landscaping, lakes, grading and other improvements in or to the Development.

## ARTICLE 21: CORPORATE AUTHORITY

**21.01 Corporate Authority.** If Tenant is a corporation, each of the persons executing this Lease on behalf of Tenant does hereby covenant and warrant that Tenant is a duly authorized and existing corporation, that Tenant is qualified to do business in Florida, that corporation has full right and authority to enter into this Lease, and that each and all of the persons signing on behalf of the corporation are authorized to do so. Tenant shall provide Landlord with evidence reasonably satisfactory to Landlord confirming the foregoing covenants and warranties.

## ARTICLE 22: Intentionally omitted.

## ARTICLE 23: LANDLORD'S LIEN

**23.01 Landlord's Lien.** In addition to any statutory lien for rent in Landlord's favor, Landlord shall have and Tenant hereby grants to Landlord a continuing security interest for all rentals and other sums of money becoming due hereunder from Tenant, upon all goods, wares, equipment, fixtures, furniture, inventory, accounts, contract rights, chattel paper and other personal property of Tenant situated on the Premises, and such property shall not be removed therefrom without the consent of Landlord until all arrearages in rent as well as any and all other sums of money then due to Landlord hereunder shall first have been paid and discharged. In the event of a default under this Lease, Landlord shall have, in addition to any other remedies provided herein or by law, all rights and remedies under the Uniform Commercial Code, including without limitation the right to sell the property described in this Section at public or private sale upon five (5) days' notice to Tenant. Tenant hereby agrees to execute such financing statements and other instruments necessary or desirable in Landlord's discretion to perfect the security interest hereby created.   Notwithstanding the above, Landlord agrees to subordinate its foregoing contractual lien rights to a third party providing furniture, fixtures and/or equipment for Tenant's use in the Premises during the Term (or providing funds for the acquisition of same) on the form attached hereto as Exhibit I, provided that: (i) there is no uncured Event of Default by Tenant under the Lease at the time of such subordination; (ii) such subordination shall be limited to the specified items, amount and time stated in the subordinating instrument; and (iii) such subordination shall be in writing, signed by all parties and in a form reasonably acceptable to Landlord.   Tenant shall reimburse Landlord for the reasonable attorney's fees actually incurred by Landlord in reviewing and/or negotiating such instruments of subordination.

## ARTICLE 24: SUBORDINATION.

**24.01 Subordination.** Tenant accepts this Lease subject and subordinate to any mortgage and/or deed of trust now or at any time hereafter constituting a lien or charge upon the Development, the Building, or the Premises without the necessity of any act or execution of any additional instrument of subordination; provided, however, that if the mortgagee, trustee, or holder of any such mortgage or deed of trust elects to have Tenant's interest in this Lease superior to any such instrument, then by notice to Tenant from such mortgagee, trustee or holder, this Lease shall be deemed superior to such lien, whether this Lease was executed before or after said mortgage or deed of trust. Tenant shall at any time hereafter on demand execute any instruments, releases or other documents which may be required by any mortgagee for the purpose of evidencing the subjection and subordination of this Lease to the lien of any such mortgage or for the purpose of evidencing the superiority of this Lease to the lien of any such mortgage, as may be the case. Notwithstanding the foregoing, the subordination of this Lease to future Mortgages shall be subject to Tenant's receipt of a non-disturbance which provides in substance that so long as Tenant is not in default under the Lease past applicable cure periods, its use and occupancy of the Premises shall not be disturbed notwithstanding any default of Landlord under such Mortgage.

24

### ARTICLE 25: MECHANICS' AND OTHER LIENS.

25.01 **Mechanics and Other Liens.** Tenant shall have no authority, express or implied to create or place any lien or encumbrance of any kind or nature whatsoever upon, or in any manner to bind, the interest of Landlord in the Premises or to charge the rentals payable hereunder for any claim in favor of any person dealing with Tenant, including those who may furnish materials or perform labor for any construction or repairs, and each such claim shall affect and each such lien shall attach to, if at all, only the leasehold interest granted to Tenant by this instrument. Tenant covenants and agrees that it will pay or cause to be paid all sums legally due and payable by it on account of any labor performed or materials furnished in connection with any work performed on the Premises on which any lien is or can be validly and legally asserted against its leasehold interest in the Premises or the improvements thereon and that it will save and hold Landlord harmless from any and all loss, cost or expense based on or arising out of asserted claims or liens against the leasehold estate or against the right, title and interest of Landlord in the Premises or under the terms of this Lease. Tenant will not permit any mechanic's lien or liens or any other liens which may be imposed by law affecting Landlord's or its mortgagees' interest in the Development to be placed upon the Development, and in case of the filing of any such lien Tenant will promptly pay same. If any such lien shall remain in force and effect for twenty (20) days after written notice thereof, Landlord shall have the right and privilege at Landlord's option of paying and discharging the same or any portion thereof without inquiry as to the validity thereof, and any amounts so paid, including expenses and interest, shall 'be so much additional indebtedness hereunder due from Tenant to Landlord and shall be repaid to Landlord immediately on rendition of a bill therefore. Notwithstanding the foregoing, Tenant shall have the right to contest any such lien in good faith and with all due diligence so long as any such contest, or action taken in connection therewith, protects the interest of Landlord and Landlord's mortgage in the Premises and Landlord and any such mortgagee are, by the expiration of said twenty (20) day period, furnished such protection and indemnification against any loss, cost or expense related to any such Lien and the contest thereof as are satisfactory to Landlord and any such mortgagee. Tenant shall notify all potential lienors with which it deals of the contents of this Section 25.01. Notwithstanding the above, Tenant shall have up to thirty (30) days from receiving notice of a lien to discharge the lien or bond off the lien. This provision relates only to work claimed to have been done for the Tenant at the Tenant's request. This provision does not apply to work done by the Landlord for Tenant's initial occupancy.

### ARTICLE 26: NOTICES

26.01 **Notices.** Each provision of this instrument or of any applicable governmental laws, ordinances, regulations and other requirements with reference to the sending, mailing or delivery of any notice or the making of any payment shall be deemed to be complied with when and if the following steps are taken:

(a) All Base Rent and other payments required to be made by Tenant to Landlord shall be payable to **RADICE III, LLC c/o BLDG ID: 831301; P.O. BOX 164110, MIAMI, FLORIDA, 33116**, or at such other address as Landlord may specify from time to time by written notice delivered in accordance herewith.

(b) Any notice or document required or permitted to be delivered hereunder shall be deemed to be delivered, whether actually received or not, when deposited in the United States Mail, postage prepaid, Certified or Registered Mail, addressed to the parties hereto at the respective addresses set out below, or at such other address as they have theretofore specified by written notice delivered in accordance herewith Section 14 of the BLI Rider.

If and when included within the term "Landlord" or "Tenant", as used in this instrument, there is more than one person, firm or corporation, all shall jointly arrange among themselves for their joint execution of such a notice specifying some individual at some specific address for the receipt of notices and payments. All parties included within the terms "Landlord" and "Tenant," respectively, shall be

25

bound by notices given in accordance with the provisions of this paragraph to the same effect as if each had received such notice.

## ARTICLE 27: COMMON AREAS

**27.01 Common Areas.** Tenant and its employees, customers and licensees shall have the non-exclusive right to use, in common with the other parties occupying the Development, lobbies, elevators, common rest rooms, common hallways, and common parking areas, subject to such reasonable rules, posted signs and regulations as Landlord may, from time to time, prescribe and Landlord's right to alter common areas as provided in Section 20.01.

## ARTICLE 28: ESTOPPEL CERTIFICATE

**28.01 Estoppel Certificate.** Tenant shall at any time and from time to time within ten (10) business days after written request from Landlord, but no more than once in any twelve (12) month period, execute and deliver to Landlord or any prospective landlord, mortgagee or prospective mortgagee a sworn and acknowledged estoppel certificate, in form reasonably satisfactory to Landlord, any prospective landlord, mortgagee or prospective mortgagee certifying and stating as follows: (a) this Lease has not been modified or amended (or if modified or amended, setting forth such modifications or amendments); (b) this Lease as so modified or amended is in full force and effect (or if not in full force and effect. the reasons therefore); (c) Tenant has no offsets or defenses to its performance of the terms and provisions of this Lease, including the payment of rent, or if there are any such defenses or offsets, specifying the same; (d) Tenant is in possession of the Premises, if such be the case: (e) if an assignment of rents or leases has been served upon Tenant by a mortgagee or prospective mortgagee, Tenant has received such assignment and agrees to be bound by the provisions thereof; and (f) any other accurate statements reasonably required by Landlord, any prospective landlord, mortgagee or prospective mortgagee. It is intended that any such statement delivered pursuant to this subsection may be relied upon by any prospective purchaser or mortgagee and their respective successors and assigns and Tenant shall be liable for all loss, cost or expense resulting from the failure of any sale or funding of any loan caused by any misstatement contained in such estoppel certificate. Tenant hereby irrevocably appoints Landlord as attorney-in-fact for the Tenant with full power and authority to execute and deliver in the name of Tenant such estoppel certificate if Tenant fails to deliver the same within such ten (10) business day period and such certificate as signed by Landlord shall be fully binding on Tenant if Tenant fails to deliver a contrary certificate within five (5) business days after receipt by Tenant of a copy of the certificate executed by Landlord on behalf of Tenant. In addition to any other remedy Landlord may have hereunder, Landlord may, at its option, if Tenant does not deliver to Landlord an estoppel certificate as set forth above within fifteen (15) business days after Tenant is requested so to do, cancel this Lease effective the last day of the then current month, without incurring any liability on account thereof, and the Term is expressly limited accordingly.

## ARTICLE 29: MISCELLANEOUS

**29.01 Gender.** Words of any gender used in this Lease shall be held and construed to include any other gender, and words in the singular number shall be held to include the plural unless the context otherwise requires.

**29.02 Successors and Assigns; Authority.** The terms, provisions and covenants and conditions contained in this Lease shall apply to, inure to the benefit of, and be binding upon, the parties hereto and upon their respective heirs, legal representatives, successors and permitted assigns, except as otherwise herein expressly provided. Landlord shall have the right to assign any of its rights and obligations under this Lease and Landlord's grantee or Landlord's successor, as the case may be, shall upon such assignment, become Landlord hereunder, thereby freeing and relieving the grantor or assignor, as the case may be, of all covenants and obligations of Landlord hereunder. Each party agrees to furnish to the other, promptly upon demand, a corporate resolution, proof of due authorization by partners, or other appropriate documentation evidencing the due authorization of such party to enter into this Lease.



Nothing herein contained shall give any other tenant in the Development or the Building any enforceable rights either against Landlord or Tenant as a result of the covenants and obligations of either party set forth herein. If there is more than one Tenant, the obligations of Tenant shall be joint and several. Any indemnification of, insurance of, or option granted to Landlord shall also include or be exercisable by Landlord's agents and employees. This Lease requires approval from Landlord's lender and as such the Lease shall not be binding until receipt of such approval.

**29.03 Captions.** The captions inserted in this Lease are for convenience only and in no way define, limit or otherwise describe the scope or intent of this Lease, or any provision hereof, or in any way affect the interpretation of this Lease.

**29.04 Landlord's Liability.** Except in the case of gross negligence on behalf of the Landlord, Tenant agrees that Landlord's liability for any breach of any contractual obligation of this Lease shall not exceed the amount of Base Rent and Additional Rent then remaining unpaid for the then current Term (exclusive of any renewal periods which have not then actually commenced). This provision is not intended to be a measure or agreed amount of Landlord's liability with respect to any particular breach, and shall not be utilized by any court or otherwise for the purpose of determining any liability of Landlord hereunder, except only as a maximum amount not to be exceeded in any event. In addition, it is expressly understood and agreed that nothing in this Lease shall be construed as creating any liability against Landlord, or its successors and assigns, personally, and in particular without limiting the generality of the foregoing, there shall be no personal liability to pay any indebtedness accruing hereunder or to perform any covenant, either express or implied, herein contained, and that all personal liability of Landlord, or its successors and assigns, of every sort, if any, is hereby expressly waived by Tenant, and that so far as Landlord, or its successors and assigns, is concerned Tenant shall look solely to the Building for the payment thereof.

**29.05 Amendment.** This Lease may not be altered, changed or amended except by an instrument in writing signed by both parties hereto.

**29.06 Survival; Surrender.** All obligations of Tenant not fully performed as of the expiration or earlier termination of the Term of this Lease shall survive the expiration or earlier termination of the Term, including without limitation, all payment obligations with respect to Taxes and Operating Costs and all obligations concerning the condition of the Premises. Upon the expiration or earlier termination of the Term, and prior to Tenant vacating the Premises, Landlord and Tenant shall jointly inspect the Premises and Landlord shall reasonably estimate the cost of any such repair. Tenant may elect to self-repair the Premises using a contractor reasonably acceptable to Landlord, or shall pay to Landlord the amount estimated by Landlord necessary to put the Premises in good condition and repair. Any work required to be done by Tenant prior to its vacation of the Premises which has not been completed upon such vacation, shall be completed by Landlord and billed to Tenant. Tenant shall also, prior to vacating the Premises, pay to Landlord the amount, as estimated by Landlord, of Tenant's obligation hereunder for Taxes and Operating Costs. All such amounts shall be used and held by Landlord for payment of such obligations of Tenant hereunder, with Tenant being liable for any additional costs therefore upon demand by Landlord, or with any excess to be returned to Tenant after all such obligations have been determined and satisfied, as the case may be. Any security deposit held by Landlord shall be credited against the amount payable by Tenant under this Section. If Tenant abandons or surrenders the premises, or is dispossessed by process of law or otherwise, Tenant shall remove its personal property from the Premises. If Tenant fails to remove its personal property, Landlord, at its option may treat such failure as a hold over as defined in the Lease, and/or may (without liability to Tenant for loss thereof), at Tenant's sole cost and in addition to Landlord's other rights and remedies under this Lease, at law or in equity: (a) remove and store such items; and /or (b) upon ten days prior notice to Tenant, sell all or any such items at private or public sale for such price as Landlord at its discretion may obtain. Landlord shall apply the proceeds of any such sale to any amounts due to Landlord under this Lease from Tenant (including Landlord's attorneys fees and other costs incurred in the removal, storage and/or sale of such items), with any remainder to be paid to Tenant.

 27



SC

**29.07 Invalidity.** If any clause, provision or portion of this Lease or the application thereof to any person or circumstance shall be invalid or unenforceable under applicable law, such event shall not affect, impair or render invalid or unenforceable the remainder of this Lease nor any other clause, phrase, provision or portion hereof, nor shall it affect the application of any clause, phrase, provision or portion hereof to other persons or circumstances, and it is also the intention of the parties to this Lease that in lieu of each such clause, phrase, provision or portion of this Lease that is invalid or unenforceable, there be added as a part of this Lease a clause, phrase, provision or portion as similar in terms to such invalid or unenforceable clause, phrase, provision or portion as may be possible and be valid and enforceable.

**29.08 Execution.** Submission of this Lease shall not be deemed to be a reservation of the Premises. Landlord shall not be bound hereby until its delivery to Tenant of an executed copy hereof signed by Landlord, already having been signed by Tenant, and until such delivery Landlord reserves the right to exhibit and lease the Premises to other prospective tenants. Notwithstanding anything contained herein to the contrary, Landlord may withhold delivery of possession of the Premises from Tenant until such time as Tenant has paid to Landlord the security deposit required hereunder, the first month's Base Rent and Additional Rent and any other sums required hereunder.

**29.09 Effective Date.** All references in this Lease to "the date hereof" or similar references shall be deemed to refer to the last date in point of time, on which all parties hereto have executed this Lease.

**29.10 Time Periods.** Whenever a time period is prescribed for action to be taken by either party, such party shall not be liable or responsible for, and there shall be excluded from the computation for any such time period, any delays due to causes beyond the control of such party, provided that this shall not apply to the Tenant's payment of Base Rent and Additional Rent, which shall be made timely.

**29.11 Americans With Disabilities Act ("ADA"):** Landlord shall deliver space which complies with current ADA code. Throughout the term of the lease, Tenant, at Tenant's sole expense, shall comply with all laws, rules, orders, ordinances, directions, regulations and requirements of federal, state, county and municipal authorities as applicable now in force or which may hereafter be in force, which shall impose any duty upon the Landlord or Tenant with respect to the use, occupation or alteration of the Premises.

**29.12 Brokers Disclosure:** Tenant covenants, warrants and represents that no broker or finder, except those set forth in Section 16 of the BLI Rider ("Brokers"), were instrumental in consummating this Lease and that Tenant has had no conversations or negotiations with any broker, except Brokers, concerning the subject matter of this Lease. Tenant agrees hereby to indemnify and hold Landlord harmless against and from any and all claims for any brokerage commissions or fees and all costs, expenses and liabilities, including, without limitation, attorneys' fees and expenses, arising out of any conversations or negotiations had by Tenant with any broker, except Brokers, or any breach of the foregoing covenant, warranty and representation.

**29.13 Rentable Square Feet:** The parties agree that for the purpose of this Lease the "Rentable Square Feet" shall mean the useable square feet of the Premises, together with an additional amount representing a portion of the Common Areas, Service Areas and other non-tenant space in the Building. Landlord and Tenant acknowledge and accept the square footage as set forth in the Lease and neither Landlord nor Tenant shall have the right to demand remeasurement or recalculation of the Rentable Square Feet amounts within the Building or the Premises.

## ARTICLE 30: RIDERS; EXHIBITS

**30.01 Rider; Exhibits.** Attached to this Lease is the Basic Lease Information Rider and the following Exhibits: Exhibit A-Legal Description; Exhibit B-Floor Plan; Exhibit C-1 -Space Plan Suite 500; Exhibit C-2-Space Plan Suite 600; Exhibit D-Leased Equipment and Furniture; Exhibit E-Tenant Estoppel Statement; Exhibit F-Rules and Regulations; Exhibit G-Option to Renew; Exhibit H-Right of First Offer. A Rider is not attached containing additional terms. All such Exhibits and the Rider, if any,

are hereby incorporated herein.

## ARTICLE 31: VACATION.

**31.01 Vacation.** The Lease and the tenancy hereby created shall cease and terminate at the end of the Term, or any renewal or extension thereof, without the necessity of notice from either Landlord or Tenant to terminate the same.

## ARTICLE 32: BUILDING SERVICES EQUIPMENT.

**32.01 Building Services Equipment.** At any time during the Term, Landlord may elect, at its sole discretion and expense, to have installed in the Building (or to have removed after installation) any equipment to (a) electronically monitor ingress and egress to and from the Building, (b) automatically detect the presence of smoke and fire in the Building or (c) otherwise protect persons and/or property within the Building from loss or damage (the "Building Services Equipment"). Tenant agrees to comply and to cause its agents, employees, patrons, visitors, contractors, licensees and permitees to comply with any and all reasonable requirements and procedures of Landlord with respect to any Building Services Equipment, including, without limitation, all requirements and procedures for the issuance, use and cancellation of entry cards for an entrance monitoring system. Landlord assumes no obligation to Tenant by reason of the installation of any such Building Services Equipment and neither Landlord nor its agents shall be liable to Tenant or Tenant's agents, employees, patrons, visitors, contractors, licensees and permitees or to any other person whomsoever for any injury to person or damage to property on or about the Premises or any losses resulting from and/or caused in part or whole by any cause whatsoever relating to any Building Services Equipment, including, without limitation, an unauthorized entry of any kind or a malfunction, interruption or failure of the Building Services Equipment.

## ARTICLE 33: RULES AND REGULATIONS

**33.01 Rules and Regulations.** Tenant shall faithfully observe and comply with the rules and regulations attached to this Lease as Exhibit F and all reasonable modifications thereof or additions thereto from time to time put into effect by Landlord. Landlord shall not be responsible for the nonperformance by any other tenant or occupant of the Building of any said rules and regulations. Any modification or addition to the rules and regulations by Landlord shall be: (i) reasonable and consistent with rules and regulations imposed in similar properties, (ii) no more burdensome or costly than the rules and regulations initially proposed, (iii) subject to other lease provisions, (iv) related only to common areas and not the Premises, and (v) uniformly enforced.

## ARTICLE 34: WAIVER OF JURY TRIAL

**34.01** **Waiver of Jury Trial and Right of Redemption**: It is mutually agreed by and between Landlord and Tenant that, to the fullest extent allowed by law, the respective parties hereto do hereby waive trial by jury in any action, proceeding or counterclaim brought by either party hereto against the other pertaining to any matter whatsoever arising out of or in any way connected with this Lease, Tenant's use of occupancy of the Premises or any claim of injury or damage. Furthermore, Tenant hereby expressly waives any and all rights of redemption granted by or under any present or future laws in the event of Tenant's being evicted or dispossessed for any cause, or in the event of Landlord's obtaining possession of the Premises, by reason of the violation by Tenant of any of the covenants and conditions of this Lease, or otherwise to redeem and repossess the Premises, or any part thereof, or to reinstate this Lease.

## ARTICLE 35: PARKING

**35.01** The parking ratio at the building in which the Premises are located is four (4) spaces per 1,000 rentable square feet, and each tenant is entitled to their pro rata share of spaces on a non-exclusive, first come, first served basis ("Non-Exclusive Spaces"), at no cost to Tenant. In addition to the Non

SC          *AMR*          

Exclusive Spaces, Tenant shall have the right to use six (6) reserved canopy spaces ("Canopy Spaces") at no cost to Tenant. Tenant shall maintain the canopies in good condition and repair at Tenant's sole cost and expense.

35.02    In the event in Landlord's reasonable judgment Tenant is using parking spaces above its pro rata share, Landlord shall notify Tenant and Tenant shall have thirty (30) days to rectify this situation. If after such thirty (30) days Tenant continues to use parking spaces above its pro rata share, and Landlord decides in its sole discretion that this situation is harming its ability to service/retain existing tenants or attract future tenants, then Landlord shall have the right to place Tenant in default under the Lease, and Landlord may proceed with its remedies pursuant to Section 19.02 above and including but not limited to the right to terminate the Lease. Notwithstanding anything set forth in Article 5.01 above, in the event the Landlord believes that Tenant's population density within the Premises exceeds 180 persons, and thereafter Landlord  provides written notice to Tenant that Tenant is in violation of its pro-rata share parking ratio (four (4) spaces per 1,000 rentable square feet for Non-Exclusive Spaces), in any action by Landlord to enforce this Section of the Lease, it shall be Tenant's burden to prove by a preponderance of the evidence that it is not in violation of its pro-rata share parking ratio (four (4) spaces per 1,000 rentable square feet) for Non-Exclusive Spaces.

Landlord shall provide Tenant with written notice and give Tenant at least thirty (30) days to cure the situation before taking any additional action but in no event shall Landlord be obligated to provide such notice with (30) days to cure more than once every other calendar year (once every 2 years).

35.03    Landlord, at Landlord's expense, has and reserves the right to alter the methods used to control parking and the right to establish such controls and rules and regulations (such as parking stickers to be affixed to vehicles) regarding parking that Landlord may deem desirable. Without liability, Landlord will have the right to tow or otherwise remove vehicles improperly parked, blocking ingress or egress lanes, or violating parking rules, at the expense of the offending tenant and/or owner of the vehicle. If and when so requested by Landlord, Tenant shall furnish Landlord with the license numbers of any vehicles of Tenant, its agents and employees. Landlord shall not be responsible for damage to or theft of any car, its accessories or contents whether the same be the result of negligence or otherwise.

## ARTICLE 36: LEASED EQUIPMENT.

36.01    Upon the Commencement Date Landlord shall lease to Tenant at no additional rent the furniture and equipment currently located in Suite 500 identified on Exhibit H ("Leased Equipment"). Tenant shall have the exclusive use of the Leased Equipment throughout the Lease Term and any renewals thereof.  Tenant shall maintain and repair the Leased Equipment at Tenant's sole cost and expense.  Tenant shall not remove the Leased Equipment from the Premises during the Lease Term. Tenant shall notify Landlord if Tenant wants the Landlord to remove the furniture from the space, during the lease term. Tenant shall insure the Leased Equipment for its current value in the event of any casualty at Tenant's sole cost and expense.   Tenant accepts the Leased Equipment in its "As-Is" condition. Landlord makes no representations or warranties with respect to the Leased Equipment and Tenant agrees to hold Landlord harmless with respect to Tenant's use of the Leased Equipment.  In the event there are no Events of Default beyond the applicable cure period during the Term of the Lease, on or before the date that is six (6) months prior to the Lease expiration date, Landlord shall convey the Leased Equipment by Quit Claim Bill of Sale to Tenant for the sum of $1.00.

*Signature page to follow*

30



The parties intending to be bound hereby execute or cause this Lease to be executed this _31_ day of _Dec_____, 2014.

WITNESSES

_Salon Fan_____
_____

TENANT:

**PRGI, Inc.**
a Florida corporation

By: _Sushma Chhabra_____

Print Name: _Sushma Chhabra_____

Date: _12/31_____, 2014

**Online Education Ventures, LLC**
a Florida limited liability company

_Salon Fan_____
_____

By: _Sushma Chhabra_____

Print Name: _Sushma Chhabra_____

Date: _12/31_____, 2014

**CareHQ, Inc.**
a Deleware corporation

_Salon Fan_____
_____

By: _Diane Sugimoto_____

Print Name: _Diane Sugimoto_____

Date: _12/31_____, 2014

**3RX Consulting, LLC**
a Florida limited liability company

_____
_Shirley D. Roy_____

By: _Amy Roy-Haeger_____

Print Name: _Amy Roy-Haeger_____

Date: _12/31_____, 2014

_AMR_ 31

SC

**Law Firm Headquarters, LLC**
a Nevada limited liability company

By: _Diane Sugimoto_

Print Name: _Diane Sugimoto_

Date: _12/31_____, 2014

**Excelium Management, LLC**
a Florida limited liability company

By: _Diane Sugimoto_

Print Name: _Diane Sugimoto_

Date: _12/31_____, 2014

WITNESSES:

LANDLORD:

**RADICE II, LLC,**
a Florida limited liability company

By: _____

Its: _Manager_

Date: _1/7/2015_

32

# EXHIBIT A
# LEGAL DESCRIPTION

**Legal Description**
**Radius Corporate Center III**

LAND DESCRIPTION: (Parcel 1)
A portion of tracts 4 and 5 of "Shell at I-95", according to the plat thereof, as recorded in Plat Book 102, page 25 of the public records of Broward County, Florida, more particularly described as follows:

COMMENCING AT THE SOUTHEAST CORNER OF SAID TRACT 5; THENCE NORTH 00° 01' 43" WEST ALONG THE EASTERLY BOUNDARY OF SAID TRACT 5 FOR 343.59 FEET; THENCE CONTINUING ALONG SAID BOUNDARY, NORTH 39° 01' 53" WEST FOR 430.00 FEET TO THE POINT OF BEGINNING; THENCE SOUTH 45° 13' 29" WEST FOR 140.30 FEET; THENCE WEST FOR 552.47 FEET TO THE WEST BOUNDARY OF SAID TRACT 4; THENCE NORTH ALONG SAID WEST BOUNDARY FOR 441.90 FEET. THENCE CONTINUING ALONG SAID BOUNDARY, NORTH 35° 15' 41" EAST FOR 194.59 FEET; THENCE NORTH 39° 56' 39" EAST FOR 41.32 FEET TO A POINT ON A CURVE CONCAVE TO THE SOUTHWEST AND HAVING A RADIUS OF 602.77 FEET, SAID POINT HAVING A RADIAL BEARING OF NORTH 23° 52' 02" EAST; THENCE SOUTHEASTERLY ALONG SAID CURVE FOR 250.36 FEET, THROUGH A DELTA OF 25° 00' 05"; THENCE SOUTH 39° 01' 52" EAST FOR 456.64 FEET TO THE POINT OF BEGINNING.

TOGETHER WITH: (Parcel 2)
A non-exclusive easement for ingress and egress created by Grant of Easement as recorded on June 20, 1985 in official records book 12646, page 825 of the Public Records of Broward County, Florida, described as follows:

BEGINNING AT THE SOUTHWEST CORNER OF TRACT 5 OF "SHELL AT I-95" AS RECORDED IN PLAT BOOK 102, PAGE 26 OF THE PUBLIC RECORDS OF BROWARD COUNTY, FLORIDA, RUN NORTH 00° 31' 30" WEST FOR 60.00 FEET; THENCE NORTH ALONG THE WESTERLY BOUNDARY OF VACATED NORTHEAST 7TH AVENUE AND TRACT 4 OF AFORESAID PLAT FOR 571.00 FEET; THENCE EAST FOR 70.00 FEET THENCE SOUTH ALONG WEST BOUNDARY OF SOUTH 03° 41' 12" WEST FOR 155.52 FEET; THENCE SOUTH ALONG WEST BOUNDARY OF TRACT 6 OF AFORESAID PLAT FOR 278.05 FEET TO THE POINT OF BEGINNING.

TOGETHER WITH: (Parcel 3)
A non-exclusive easement for ingress and egress created by a Quit Claim Deed recorded on June 28, 1985 in official records book 12646, page 839 of the Public Records of Broward County, Florida, described as follows:

BEGINNING AT THE NORTHWEST CORNER OF TRACT 2 OF "SHELL AT I-95" AS RECORDED IN PLAT BOOK 102, PAGE 26 OF THE PUBLIC RECORDS OF BROWARD COUNTY, FLORIDA, RUN SOUTH ALONG THE WEST BOUNDARY OF SAID TRACT 2 FOR 116.87 FEET TO THE POINT OF CURVATURE OF A CURVE CONCAVE TO THE NORTHEAST AND HAVING A RADIUS OF 300.00 FEET; THENCE SOUTHEASTERLY ALONG SAID CURVE FOR 175.93 FEET, THROUGH A CENTRAL ANGLE OF 33° 36' 13" TO THE POINT OF CURVATURE OF A CURVE CONCAVE TO THE SOUTHWEST AND HAVING A RADIUS OF 300.00 FEET; THENCE SOUTHEASTERLY ALONG SAID CURVE FOR 175.93 FEET, THROUGH A CENTRAL ANGLE OF 33° 36'13"; THENCE TANGENT TO AFORESAID CURVE, SOUTH FOR 32.35 FEET; THENCE SOUTH 42° 07' 23" EAST FOR 33.54 FEET TO THE NORTHERLY RIGHT-OF-WAY LINE OF NORTHEAST 62ND STREET AS SHOWN ON AFORESAID PLAT, SAID POINT BEING ON A CURVE CONCAVE TO THE SOUTHWEST HAVING A RADIUS OF 5784.58 FEET AND SAID POINT HAVING A RADIAL BEARING OF NORTH 05° 45' 10" EAST; THENCE NORTHWESTERLY ALONG SAID CURVE AND RIGHT-OF-WAY LINE FOR 129.96 FEET, THROUGH A CENTRAL ANGLE OF 01° 17' 14"; THENCE NORTH 47° 35' 58" EAST ALONG THE EASTERLY BOUNDARY OF TRACT 1 OF AFORESAID PLAT FOR 36.70 FEET; THENCE NORTH FOR 54.91 FEET TO THE POINT OF CURVATURE OF A CURVE CONCAVE TO THE SOUTHWEST AND HAVING A RADIUS OF 340.00 FEET; THENCE NORTHWESTERLY ALONG SAID CURVE FOR 151.85 FEET, THROUGH A CENTRAL ANGLE OF 25° 33' 47" TO THE POINT OF CURVATURE OF A CURVE CONCAVE TO THE NORTHEAST AND HAVING A RADIUS OF 480.00 FEET; THENCE NORTHWESTERLY ALONG SAID CURVE FOR 214.18 FEET, THROUGH A CENTRAL ANGLE OF 25° 33' 47" THENCE NORTH ALONG THE WESTERLY BOUNDARY OF VACATED NORTHEAST 7TH AVENUE AND TRACT 5 OF AFORESAID PLAT FOR 111.43 FEET; THENCE SOUTH 89° 31' 30" EAST FOR 60.00 FEET TO THE POINT OF BEGINNING.



**EXHIBIT B**
**SITE PLAN**



Six (6) reserved parking spaces

34



**EXHIBIT C-1**
**SUITE 500 SPACE PLAN**



35



**EXHIBIT C-2**
**SUITE 600 SPACE PLAN**



**EXHIBIT D**
**LEASED EQUIPMENT**

### Radice – 5th & 6th Floor Leased Equipment

**Seating**

| | |
|---|---|
| Conference Rm Chairs (mid-back) | 41 |
| Boardroom Chairs (high-back) | 19 |
| Guest Chairs (non-Swivel) | 130 |
| Task Chairs (mid-back & adjustable) | 54 |
| Desk Chair (executive high-back) | 12 |
| Kitchen Chairs | 12 |

**Conference Tables**

| | |
|---|---|
| Round | 4 |
| Square | 13 |
| Oval | 5 |
| Boardroom | 1 |
| Kitchen Table | 4 |

**Files**

| | |
|---|---|
| 2 Drawer | 10 |
| 4 Drawer | 3 |
| 5 Drawer | 1 |

**Cubicles**

| | |
|---|---|
| 6 x 6 | 21 |
| 8 x 8 | 27 |
| 6 x 7 | 2 |
| 8 x 10 | 4 |

**Desks**

| | |
|---|---|
| U-Shaped | 16 |
| L-Shaped | 8 |

**Other**

| | |
|---|---|
| Refrigerators | 2 |

37

**EXHIBIT E**
**TENANT ESTOPPEL STATEMENT**

LEASE DATED: _____     AMENDED: _____
LANDLORD: _____
TENANT: _P R G I, Inc._____
PREMISES: _____

      As Tenant under the above referenced Lease, the undersigned certifies for the benefit of _____, which has made or is about to make a loan to Landlord part of the security for which will be a mortgage or deed of trust covering the Premises and an assignment of Landlord's interest in the Lease, the following:

1.   The Lease has not been modified or amended, except by documents dated _____ copies of which are attached hereto.

2.   The Lease (as so modified or amended) is in full force and effect and represents the entire agreement between Landlord and Tenant.

3.   Tenant has no offsets or defenses to its performance of the terms and provisions of the Lease, including the payment of rent and Landlord is not in default under any of the terms, covenants or provisions of the Lease.

4.   Tenant is in possession of the Premises and has accepted the Premises, including all alterations, additions and improvements required to be made by Landlord.

    The Premises contains _____ square feet.

5.   The Rent Commencement Date is _____, 2000, and the Term is _____ months ending on _____ 2000.  The Lease provides for the following renewal option (s) _____ at a rental rate of _____.

6.   Tenant acknowledges that the Premises have been delivered to Tenant in good order and condition.

7.   The Lease provides for rent payable as follows:

    (a) *Base Rent.* Base Rent payable monthly of $_____ .The Base Rent in any Comparison Year is adjusted to reflect increases in the Consumer Price Index.

    (b) *Taxes.* The Lease provides for Tenant to pay its proportionate share of Taxes in excess of $_____ per tax year.

    (c) *Operating Costs.* The Lease provides for Tenant to pay its proportionate share of Operating Costs in excess of $_____ per calendar year.

    (d) Tenant has commenced paying rent. No rent has been paid in advance except for the Base Rent that became due for the current month.

8.   Landlord is holding a security deposit of $_____ .





9. The Lease contains no first right of refusal, option to expand, option to terminate, or exclusive business rights, except as follows:

_____

10. Tenant has not entered into any sublease, assignment or any other agreement transferring any of its interest in the Lease and that it has not received any notice of a prior assignment, hypothecation or pledge of rents by Landlord.

11. Tenant has delivered to Landlord all evidence of insurance which Tenant is required to provide under the Lease.

Date: ___12/31/2014___

TENANT: Suhme Chhabra

BY: PRGI, Inc

ITS: Pres.

39

## EXHIBIT F
## RULES AND REGULATIONS

1.  The sidewalks, halls, passages, exits, entrances, elevators, escalators and stairways shall not be obstructed by Tenant or used for any purpose other than for ingress and egress from its Premises. The halls, passages, exits, entrances, elevators and stairways are not for the use of the general public and Landlord shall in all cases retain the right to control and prevent access thereto by all persons whose presence, in the judgment of Landlord, shall be prejudicial to the safety, character, reputation and interests of the Building and its tenants, provided that nothing herein contained shall be construed to prevent such access to persons with whom Tenant normally deals in the ordinary course of Tenant's business unless such persons are engaged in illegal activities. Tenant shall not go upon the roof of the Building.

2.  The bulletin board or directory of the Building will be provided exclusively for the display of the name and location tenants and Landlord reserves the right to exclude any other names therefrom.

3.  No curtains, draperies, blinds, shutters, shades, screens or other coverings, awnings, hangings or decorations shall be attached to, hung or placed in, or used in connection with, any window or door on the Premises without the prior written consent of Landlord. In any event, all such items shall be installed inboard of Landlord's standard window covering and &hall in no way be visible from the exterior of the Building. No articles shall be placed on the window sills so as to be visible from the exterior of the Building. No articles shall be placed against glass partitions or doors which might appear unsightly from outside Tenant's Premises.

4.  Landlord reserves the right to exclude from the Building between the hours of 6:00 p.m. and 8:00 a.m. weekdays, and at all hours on Saturdays, Sundays, and holidays all persons who are not tenants or their accompanied guests. Tenant shall be responsible for all persons it allows to enter the Building and shall be liable to Landlord for all acts of such persons.

    Landlord shall in no case be liable for damages for error with regard to the admission or exclusion of any person from the Building.

    During the continuance of any invasion, mob, riot, public excitement or other circumstances rendering such action advisable in Landlord's opinion, Landlord reserves the right to prevent access to the Building by closing the doors, or otherwise, for the safety of tenants and protection of the Building and property in the Building.

5.  Tenant shall not employ any person or persons other than Landlord's janitor for the purpose of cleaning its Premises. Except with the written consent of Landlord no persons other than those approved by Landlord shall be permitted to enter the Building for the purpose of cleaning same. Tenant shall not cause any unnecessary labor by reason of its carelessness or indifference in the preservation of good order and cleanliness. Landlord shall in no way be responsible to Tenant for any loss of property on its Premises however occurring, or any damage done to the effects of Tenant by the janitor or any other employee or any other person.

6.  Tenant shall not use upon its Premises vending machines or accept barbering or bootblacking services in its Premises except from persons authorized by Landlord.

7.  Tenant shall see that all doors to its Premises are securely locked and that all utilities, water faucets or water apparatus are shut off before Tenant leaves the Premises, so as to prevent waste or damage, and shall be responsible for all injuries sustained by other tenants or occupants of the Building or Landlord as a result of its failure to do so. Tenants shall keep the door or doors to the Building corridors closed at all times except for ingress and egress.

8.  Tenant shall not waste electricity, water or air conditioning and agrees to cooperate fully with





Landlord to assure the most effective operation of the Building's heating and air conditioning, and shall refrain from attempting to adjust any controls.

9. Tenant shall not alter any lock or access device or install a new or additional lock or access device or any bolt on any door in its Premises without prior written consent of Landlord. If Landlord shall give its consent, Tenant shall in each case furnish Landlord with a key for any such lock.

10. Tenant shall not make or have made additional copies of any keys or access devices provided by Landlord. Tenant, upon the termination of the tenancy, shall deliver to Landlord all the keys or access devices to the Building, offices, rooms and toilet rooms which shall have been furnished Tenant or which Tenant shall have had made. In the event of the loss of any keys or access devices so furnished by Landlord, Tenant shall pay Landlord therefore.

11. The toilet rooms, toilets, urinals, wash bowls and other apparatus shall not be used for any purpose other than that for which they were constructed and no foreign substance of any kind whatsoever, including, but not limited to, coffee grounds shall be thrown therein, and the expense of any breakage, stoppage, or damage resulting from the violation of this rule shall be borne by the tenant, who, or whose employees or invitees shall have caused it.

12. Tenant shall not keep in the Building any kerosene, gasoline or inflammable or combustible fluid or material other than limited quantities necessary for the operation or maintenance of office equipment. Tenant shall not use any method of heating or air conditioning other than that supplied by Landlord.

13. Tenant shall not permit to be kept in its Premises any tout or noxious gas or substance or permit its Premises to be used in a manner offensive or objectionable to Landlord or other occupants of the Building by reason of noise, odors and/or vibrations or interfere in any way with other tenants or those having business therein, nor shall any animals or birds be brought or kept in or about the Building.

14. No cooking shall be done in the Premises (except that use by the Tenant of Underwriter's Laboratory approved equipment for the preparation of coffee, tea, hot chocolate and similar beverages for Tenant and its employees shall be permitted, or microwave to reheat food or liquid items, provided that such equipment and use is in accordance with applicable federal, state and city laws, codes, ordinances, rules and regulations) nor shall the Premises be used for lodging.

15. Tenant shall not sell or permit the sale, at retail, of newspapers, magazines, periodicals, theater tickets or any other goods on the Premises, nor shall Tenant carry on, or permit the business of stenography, typewriting or any similar business in or from the Premises for the service or accommodation of occupants of any other portion of the Building, nor shall the Premises be used for the storage of merchandise, manufacturing of any kind, the business of a public barber shop, or beauty parlor, or for any improper, immoral or objectionable purpose, or any business activity other than that specifically provided for in Tenant's lease.

15. Landlord will direct electricians as to where and how telephone, telegraph and electrical wires are to be introduced or installed. No boring or cutting for wires will be allowed without the prior written consent of Landlord. The location of burglar alarms, telephones, call boxes or other office equipment affixed to the Premises shall be subject to the written approval of Landlord.

17. Tenant shall not install any radio or television antenna, loudspeaker or any other device on the exterior walls or the roof of the Building. Tenant shall not interfere with radio or television broadcasting or reception from or in the Building.

18. Tenant shall not lay linoleum, tile, carpet or any other floor covering so that the same shall be

41




affixed to the floor of its Premises in any manner except as approved in writing by Landlord, which will not be unreasonably withheld. The expense of repairing any damage resulting from a violation of this rule or the removal of any floor covering shall be borne by Tenant.

19. No furniture, freight, equipment, materials, supplies, packages, merchandise or other property will be received in the Building or carried up or down elevators except between such hours and in such elevators as shall be designed by Landlord. Landlord shall have the right to prescribe the weight, size and position of all safes, furniture, files, bookcases or other heavy equipment brought into the Building. Safes or other heavy objects shall, if considered necessary by Landlord, stand on wood strips of such thickness as determined by Landlord to be necessary to properly distribute the weight thereof. Landlord will not be responsible for loss of or damage to any such safe, equipment or property from any cause, and all damage done to the Building by moving or maintaining any such safe, equipment or other property shall be repaired at the expense of Tenant.

Business machines and mechanical equipment belonging to Tenant which cause noise or vibration that may be transmitted to the structure of the Building or to any space therein to such a degree as to be objectionable to Landlord or to any tenants in the Building shall be placed and maintained by Tenant, at Tenant's expense, on vibration eliminators or other devices sufficient to eliminate noise or vibration. The persons employed to move such equipment in or out of the Building must be acceptable by Landlord.

20. Tenant shall not place a load upon any floor which exceeds the load per square foot which such floor was designed to carry and which is allowed by law. Tenant shall not mark, or drive nails, screws or drill into, the partitions, woodwork or plaster or in any way deface the Premises, not including small nails or screws to attach wall items throughout the premises.

21. There shall not be used in any space or in the public areas of the Building, either by Tenant or others, any hand trucks except those equipped with rubber tires and side guards or such other material-handling equipment as Landlord may approve. No other vehicles of any kind shall be brought by Tenant into or kept in or about the Premises.

22. Tenant shall store all its trash and garbage within the interior of its Premises. No materials shall be placed in the trash boxes or receptacles if such material is of such nature that it may not be disposed of in the ordinary and customary manner of removing and disposing of trash and garbage in this area without violation of any law or ordinance governing such disposal. All trash, garbage and refuse disposal shall be made only through entryways and elevators provided for such purposes and at such times as Landlord may designate.

23. Canvassing, soliciting or distributing of handbills or any other written material, and peddling in the Building are prohibited and Tenant shall cooperate to prevent the same. Tenant shall not make room-to-room solicitation of business from other tenants in the Building.

24. Landlord reserves the right to exclude or expel from the Building any person who, in Landlord's judgment, is intoxicated or under the influence of liquor or drugs or who is in violation of any of the rules and regulations of the Building.

25. Without the prior written consent of Landlord, Tenant shall not use the name of the Building in connection with the business of Tenant except as Tenant's address.

26. Tenant shall comply with all energy conservation, safety, fire protection and evacuation procedures and regulations established by Landlord or any governmental agency.

27. Tenant assumes any and all responsibility for protecting its Premises from theft, robbery and pilferage.

42

28. The requirements of Tenant will be attended to only upon application at the office of the Building by an authorized individual. Employees of Landlord shall not perform any work or do anything outside of their regular duties unless given special instructions from Landlord, and no such employees will admit any person (Tenant or otherwise) to any office without specific instructions from Landlord.

29. Landlord may waive anyone or more of these Rules and Regulations for the benefit of any particular Tenant, but no such waiver by Landlord shall be construed as a waiver of such Rules and Regulations in favor of any other Tenant, nor prevent Landlord from thereafter enforcing any such Rules and Regulations against all tenants of the Building.

30. Landlord reserves the right to make such other reasonable rules and regulations as in its judgment may from time to time be needed for safety and security, for care and cleanliness of the Building and for the preservation of good order therein. Tenant agrees to abide by all such Rules and Regulations herein above stated and any additional rules and regulations which are adopted. Notwithstanding the above, Use of the Premises shall be for general business, which includes, but is not limited to, the use of conference and computer facilities, employee kitchen and related facilities, and other legally permitted use consistent with the characteristics of a first-class office building in Ft. Lauderdale.

31. All wallpaper or vinyl fabric materials which Tenant may install on painted walls shall be applied with a strippable adhesive. The use of nonstrippable adhesives will cause damage to the walls when materials are removed, and repairs made necessary thereby shall be made by Landlord at Tenant's expense.

32. Tenant shall provide and maintain hard surface protective mats under all desk chairs which are equipped with coasters to avoid excessive wear and tear to carpeting. If Tenant fails to provide such mats, the cost of carpet repair or replacement made necessary by such excessive wear and tear shall be charged to and paid by Tenant.

33. Tenant will refer all contractors, contractors' representatives and installation technicians rendering any service to Tenant to Landlord for Landlord's supervision, approval, and control before performance of any contractual service. This provision shall apply to all work performed in the Building, including installations of telephones, telegraph equipment, electrical devices and attachments and installations of any nature affecting floors, walls, woodwork, trim, windows, ceilings, equipment or any other physical portion of the Building.

34. Tenant shall give prompt notice to Landlord of any accidents to or defects in plumbing, electrical fixtures, or heating apparatus so that such accidents or defects may be attended to properly.

35. Tenant shall be responsible for the observance of all of the foregoing Rules and Regulations by Tenant's employees, agents, clients, invitees and guests.

36. Tenant shall not allow its employees or invitees to park in other than designated areas, nor shall any washing of cars or car repairs be permitted in any parking areas, nor shall overnight parking be permitted, nor shall commercial trucks be allowed in the parking areas other than in designated delivery areas.

37. Other than for single-trip usages, Tenant shall make reservations for use of any elevators, which shall be accepted by Landlord on a first-come, first-serve basis.

38. These Rules and Regulations are in addition to, and shall not be construed to in any way modify, alter or amend, in whole or in part, the terms, covenants, agreements and conditions of any lease of premises in the Building.



## EXHIBIT G

## RENEWAL OPTION

a) If: (i) Tenant has not committed an Event of Default beyond the applicable cure period; (ii) the original Tenant has not assigned the Lease or sublet the Premises (but not including permitted transfers under Section 13.02); and (iii) Tenant is occupying the entire Premises at the time of such election, then Tenant may renew this Lease for one (1) additional period of five (5) years, by delivering written notice of the exercise thereof (the "**Renewal Notice**") to Landlord not later than twelve (12) months before the expiration of the Term.

b) The Renewal Terms shall be upon, and subject to, all of the terms, covenants, and conditions provided in the Lease for the initial term hereof, without any further right of extension, except:

    (1) for any terms, covenants, or conditions in the Lease that are either expressly or by their nature inapplicable to the Renewal Term; and

    (2) The Rent payable for each month during such extended Term shall be 103% of the previous years Rent and shall escalate annually by three percent. Landlord shall lease to Tenant the Premises in their then-current condition and Landlord shall not provide to Tenant any allowances (e.g., moving allowance, construction allowance, and the like) or other tenant inducements.



# EXHIBIT "H"
## RIGHT OF FIRST OFFER

a. **Offer Space.** During the Lease Term and subject to any existing rights of other tenants in the building, Tenant shall have a right of first offer ("Right of First Offer") to lease space located on the Fourth Floor and Seventh Floor of the Building (the Offer Space"), subject to Paragraphs b through j of this Exhibit.

b. **Conditions.** At the time Tenant exercises the Right of First Offer:

   (1)   The Lease must be in full force and effect; and

   (2)   Tenant shall not have been in Default under the Lease beyond any applicable cure period;

   (3)   Tenant must lease the Offer Space for a minimum of five (5) years.

c. **Space Subject to Offer.** Subject to the other terms of this Exhibit, after any part of the Offer Space has or will "become available" for leasing by the Landlord (defined in Paragraph c(1)), Landlord shall not, during the Term of this Lease or any renewal or extension thereof, lease to another tenant that available portion of the Offer Space (the "Available Offer Space") without first offering Tenant the right to lease such Available Offer Space.

   (1)   **Available Space.** Space shall be deemed to "become available" when the lease for any current tenant of all or a portion of the Offer Space expires or is otherwise terminated.

   (2)   **Space that's Not Available.** Notwithstanding Paragraph c(1), Offer Space shall not be deemed to "become available" if the space is:
      (i)   Assigned or subleased by the current tenant of the space; or
      (ii)   Re-let by the current tenant of the space by renewal, extension, or renegotiation.

d. **Landlord Notice.** Consistent with Paragraph c, Landlord shall not lease any such Available Offer Space to another tenant unless and until Landlord has first offered the Available Offer Space to Tenant in writing (the "First Offer Leasing Notice") and Tenant either rejects such offer or a period of ten (10) business days has elapsed from the date that Tenant has received the First Offer Leasing Notice without Tenant having notified Landlord in writing of its acceptance of such First Offer Leasing Notice and supplied Landlord with current financial statements pursuant to Paragraph b(3), whichever event occurs first. The First Offer Leasing Notice shall contain the following information:

   (1)   A description of the Available Offer Space (which description shall include the square footage amount and location of such Available Offer Space) and an attached floor plan that will show the Available Offer Space crosshatched;
   (2)   The date on which the Landlord expects the Available Offer Space to become available;
   (3)   The increase in Base Rent as calculated pursuant to the same rates as this Lease; and
   (4)   The Tenant's increased pro rata share of Operating Costs and Taxes.

e. **Tenant Acceptance.** If Tenant timely delivers to Landlord, in accordance with the conditions of this Exhibit, written notice of Tenant's exercise of the Right of First Offer for all of the Available Offer Space, and Landlord determines that Tenant meets all of the conditions provided in this Exhibit, then Landlord and Tenant shall execute an Amendment to the Lease which shall add the Available Offer Space to the Premises and subject to the terms and conditions in the Lease, with the exception of those Lease modifications set forth in Paragraph g.

f. **Tenant's Rejection or Failure to Meet Conditions.** If Tenant declines or fails to duly and timely exercise its Right of First Offer or fails to meet all of the conditions provided in this Exhibit, Landlord shall thereafter be free to lease the Available Offer Space in portions or in its entirety to any third-party tenant at any time without regard to the restrictions in this Exhibit and

45





on whatever terms and conditions Landlord may decide in its sole discretion, without again complying with all the provisions of this Exhibit.

g.    **Changes to Lease.** If Tenant leases the Available Offer Space pursuant to the terms of this Exhibit, all the obligations, terms, and conditions under the Lease shall also apply to the Available Offer Space except that:

    (1)    **Commencement Date.** The commencement date for the Lease for the Available Offer Space ("the Commencement Date for the Available Offer Space") shall be the day the Available Offer Space is delivered to the Tenant broom clean, free of tenants or other occupants, and in its then "as is" with no tenant improvements and Tenant has a certificate of occupancy allowing it to use the Available Space for general office purpose;

    (2)    **The Premises.** As of the Commencement Date for the Available Offer Space, the Available Offer Space shall be deemed part of the Premises;

    (3)    **Pro Rata Share.** As of the Commencement Date for the Available Offer Space, Tenant's pro rata share of Operating Costs and or Taxes shall be increased to an amount computed by dividing the amount deemed by Landlord to be the total of the rentable square footage of the Premises, including all Available Offer Space leased by Tenant, by the amount deemed by Landlord to be the rentable square footage of the Building, and expressing the fraction as a percentage;

    (4)    **Rent.** As of the Commencement Date for the Available Offer Space ("Available Offer Space Commencement Date") the Rent for the Available Offer Space shall be same rates as this Lease.

    (5)    **Term.** The Lease Term for the Offer Space shall not be less than specified above.

    (6)    **Parking.** Tenant shall receive additional non-exclusive parking spaces in proportion to the parking ratio set forth in Section 13 of the BLI Rider, with no additional reserved spaces based on the rentable square footage of the Offer Space.

h.    **Confirming Lease Amendment.** Within thirty (30) days after the Commencement Date for the Available Offer Space, Landlord and Tenant shall confirm the following in a written amendment to the Lease:

    (1)    The Commencement Date for the Available Offer Space;

    (2)    The location and size of the Available Offer Space that was leased by Tenant with an exhibit annexed showing that space crosshatched;

    (3)    The new Annual Rent to be paid by Tenant; and

    (4)    Tenant's increased pro rata share of Operating Costs and Taxes.



**EXHIBIT I**

**LANDLORD'S WAIVER**

This Landlord's Waiver (the "Agreement") is dated to be effective as of _____ ("Landlord"), by and between _____, a _____ Florida corporation ("Tenant"), and PRGI _____, a _____ ("Lender"), and each intending to be legally bound, agrees as follows:

1.    Landlord is the owner of certain premises located at _____ ("Premises"), (the which Landlord has leased to Tenant pursuant to a certain lease agreement dated "Lease"), attached hereto as Exhibit B.

2.    Lender has entered into, or is about to enter into, that certain _____ Agreement, dated as of 12\31, 2014 and certain other related agreements with Tenant (collectively, the "Loan"). The Loan, among other things, evidences certain indebtedness owed by Tenant to Lender and provides for security therefor.

3.    The security for the Loan consists of, among other collateral, certain property of Tenant, as more fully described in the Loan, all or a portion of which property is or will be located on or affixed to the Premises. For purposes of this Agreement, the only collateral that is the subject hereof are the items that are specifically described in Exhibit A attached hereto and incorporated herein by reference (the "Collateral").

4.    Landlord hereby subordinates any rights, liens, and security interests which Landlord may claim to have in and to the Collateral (including any statutory lien in favor of Landlord and any consensual security interest granted to Landlord under the Lease) to the rights, liens, and security interests of Lender in the Collateral.

5.    Landlord agrees that the Collateral shall remain personal property and, irrespective of the manner of attachment to the Premises, shall not become a fixture or a part of the realty and may be removed by Lender as provided below. Lender agrees to send to Landlord notices of foreclosure respecting the Collateral at the same times and in the same manner as such notices are given to Tenant.

6.    The foregoing waivers by Landlord are solely for the benefit of Lender and its successors and assigns and shall be rendered null and void automatically upon the earliest to occur of (a) the expiration, termination or release of the security interest granted to Lender by Tenant, (b) the twentieth (20th) day after a termination of the Lease or of Tenant's right to possess the Premises by Landlord prior to the scheduled expiration of the term of the Lease, following Tenant's default under the Lease, or otherwise, or (c) the expiration of the term of the Lease. If any or all of the Collateral remains on or in the Premises upon the earlier to occur of the twentieth (20th) day following a termination of Tenant's right to possess the Premises as described in clause (b) of this paragraph 6 or the expiration of the term of the Lease, then Lender shall be deemed to have transferred its right, title and interest in and to the Collateral to Landlord, and Landlord may thereafter dispose of the Collateral as Landlord may see fit. Alternatively, Landlord may elect to leave the Collateral in place and charge Lender a fee, payable weekly in advance, equivalent to seven-thirtieths (7/30ths) of the monthly rental (i.e., the basic rental and all additional rent) set forth in the Lease (the "Fee"). Lender agrees to pay the Fee unless Lender has provided notice to Landlord prior to the expiration of the foregoing 20-day period that Lender has elected to not enforce its security interest in the Collateral.

7.    Lender shall give Landlord at least forty-eight (48) hours prior written notice of Lender's desire to exercise any of its rights with respect to the Collateral, including but not limited to, Lender's desire to enter the Premises and remove the Collateral. Tenant agrees that Landlord shall have no obligation to verify Lender's rights with respect to the Collateral at any time.

47





8.    Lender's right to enter the Premises for the purpose of removing Collateral therefrom is subject to (i) Lender's providing Landlord with the notice required pursuant to paragraph 7 hereof, (ii) the requirement that any such entry and removal shall be during normal business hours or at a time otherwise reasonably acceptable to Landlord, shall be at Lender's risk and expense, and shall be accomplished within the time periods set forth in Section 6, and (iii) Lender's using due care in removing the Collateral and not causing damage to the Premises as a result thereof. Lender and Tenant agree, jointly and severally, to repair any damage to the Premises caused by the removal of the Collateral by Lender or its agents, representatives, or employees. If such repairs are not commenced within five (5) days, or completed within fifteen (15) days, after notice to Lender and Tenant of the need therefor, then Landlord may cause such repairs to be performed at the joint and several expense of Lender and Tenant. Payment for any such repairs undertaken by Landlord shall be due within ten (10) days of written notice to Tenant and Lender of the amount due, with an itemized invoice. Landlord reserves the right to accompany Lender during any removal of the Collateral from the Premises.

9.    Lender shall indemnify, defend, and hold harmless Landlord from and against any claim, loss, cost or damage based on damage to property and injury to persons resulting or claimed to have resulted from any entry by Lender, or any other exercise of Lender's rights with respect to the Collateral.

10.    If there is any litigation relating to or arising out of this Agreement, the party or parties determined to be prevailing shall be entitled to recover reasonable legal fees and costs in connection with such action from the non-prevailing party or parties.

11.    All communications and payments contemplated herein shall be made in writing by personal delivery or by registered or certified mail, return receipt requested, or by telecopy or fax to the telecopy number set forth below (provided a complete copy is sent concurrently by registered or certified mail as set forth above) or by overnight delivery via Federal Express or other similar overnight air courier service (collectively, "Federal Express") to the appropriate address as set forth below (or as subsequently changed by written notice). Such communications and payments shall be deemed to be made (a) on the date of personal delivery, if delivered personally, or (b) whether or not received, on the earlier of the date received or the third day after mailing if properly mailed to the appropriate address by registered or certified mail, postage prepaid, return receipt requested, or (c) on the date sent by telecopy or fax, if sent by telecopy or fax, or (d) the day after consignment to Federal Express for overnight delivery.

If to Tenant:        PRGI, Inc.
                     P.O. Box 164438
                     Miami, FL  33116
                     Attention: Diane Sugimoto
                     Telecopy No.: _____

If to Lender:        _____
                     _____
                     _____
                     Attention: _____
                     Telecopy No.: _____

If to Landlord:      _____
                     _____
                     _____
                     Attention: _____
                     Telecopy No.: _____

With a copy to:      _____

48



```
                              _____
                              _____
Attention: _____
Telecopy No.: _____
```

12.    his Agreement may be executed in any number of counterparts and by different parties on separate counterparts, each of which, when executed and delivered, shall be deemed to be an original, and all of which, when taken together, shall constitute but one and the same Agreement.

IN WITNESS WHEREOF, the parties hereto have caused this Landlord's Waiver to be executed on the date first above written.

LANDLORD:

```
_____

By: _____
    Name: _____
    Title: _____
```

LENDER:

```
_____

By: _____
    Name: _____
    Title: _____
```

TENANT:

PRGI, Inc.

By: _Sushma Chhabra_____

Name: _Sushma Chhabra_____
Title: _President_____

# FIRST AMENDMENT TO LEASE

THIS FIRST AMENDMENT TO LEASE (this "**Amendment**") is made this ___ day of January, 2015 by and between RADICE III, LLC, a Florida limited liability company ("Landlord"), and PRGI, Inc., a Florida corporation, Online Education Ventures, LLC, a Florida limited liability company, CareHQ, Inc. a Delaware corporation, 3RX Consulting, LLC, a Florida limited liability company, Excelium Management, LLC, a Florida limited liability company, (jointly and severally referred to as "Tenant"):

## RECITALS:

A.      Landlord and Tenant Tenant entered into that Office Lease Agreement ease dated January __, 2015 (the "**Lease**"), relating to Suites 500 & Suite 600 (the "**Premises**") located in Radice Corporate Center III, 1000 Corporate Drive, Fort Lauderdale, Florida 33334 (the "**Building**").

B.      Landlord and Tenant desire to amend the Lease pursuant to the terms and conditions hereinafter described.

C.      All capitalized terms used in this Amendment shall have the meanings given to them in the Lease, as amended hereby, unless otherwise defined herein.

## AGREEMENT:

NOW, THEREFORE, in consideration of the premises and the mutual covenants herein contained, the parties hereby amend the Lease on the terms hereof effective as of the date hereof, notwithstanding anything to the contrary contained therein:

1.      **Security Deposit**. Landlord and Tenant acknowledge that Tenant has tendered to Landlord the sum of $800,000.00 as a Security Deposit pursuant to Section 3.02 of the Lease. Tenant shall deliver to Landlord a Financial Guarantee Bond (or a Letter of Credit in a form acceptable) in accordance with the terms and conditions set forth in Section 3.03 of the Lease to Landlord within ten (10) days from the date of this Amendment. Upon receipt of the Financial Guarantee Bond (or Letter of Credit), Landlord shall return the Security Deposit to Tenant. Tenant's failure to timely deliver the Financial Guarantee Bond (or Letter of Credit) shall be deemed an Event of Default.

2.      **Right of First Offer**. Section b of Exhibit H of the Lease ("Right of First Offer") is hereby amended to clarify the parties intent as follows:

**(b)**      **Conditions.**  At the time Tenant exercises the Right of First Offer:

(1)      The Lease must be in full force and effect;

(2)      Tenant shall not have been in Default under the Lease beyond any applicable cure period;

(3)      Tenant must lease the Offer Space for a minimum of five (5) years;

1

(4)     Tenant shall lease the Offer Space in "As – Is" condition, with no Tenant improvement allowance;

(5)     The Rent payable for the Offer Space shall be the Rent payable by Tenant pursuant to the Lease at the time the Lease commences for the Offer Space (without any Rent Abatement), and shall increase commensurate with the rental increases set forth in the Lease;

(6)     In the event Tenant leases the Offer Space for a period beyond the term of the Lease, the Rent shall escalate 3% per annum.

3.      **Density**. Section 5.01 of the Lease is hereby amended in its entirety as follows:

To prevent overload of the Building's structure, system and parking facilities, the population density within the Premises as a whole shall not exceed 180 persons; provided, however, Landlord agrees and acknowledges that Tenant may have up to 220 persons in the Premises for certain limited time periods. Notwithstanding the preceding line if Landlord determines that Tenant's population density in the Premises is overloading the Building's structure, system or parking facilities, Landlord shall provide Tenant with written notice and give Tenant at least thirty (30) days to cure the situation, but in no event shall Landlord be obligated to provide such notice with (30) days to cure more than once every other calendar year (once every 2 calendar years). In the event Tenant fails to cure the situation within said thirty (30) day period, then Landlord shall have the right to place Tenant in default under the Lease, and Landlord may proceed with its remedies pursuant to Section 19.02 below and including but not limited to the right to terminate the Lease. In the event the Landlord believes that Tenant's population density within the Premises exceeds 180 persons, and thereafter Landlord provides written notice to Tenant that Tenant is in violation of the density limitation stated in this Section and Tenant fails to reduce the density level to under 180 persons within thirty (30) days of Landlord's notice, in any action by Landlord to enforce this Section of the Lease, it shall be Tenant's burden to prove by a preponderance of the evidence that it is not in violation of the density limitation of 180 persons within the Premises.

4.      **Miscellaneous**.

a)      Except as modified by this Amendment, the Lease and all the terms, covenants, conditions and agreements thereof are hereby in all respects ratified, confirmed and approved. Tenant hereby affirms that on the date hereof no breach or default by either party has occurred and that the Lease, and all of its terms, conditions, covenants, agreements and provisions, except as hereby modified, are in full force and effect with no defenses or offsets thereto, and Tenant hereby releases Landlord of and from all liabilities, claims, controversies, causes of action and other matters of every nature which, through the date hereof, have or might have arisen out of or in any way in connection with the Lease and/or the Premises demised thereunder.

b)      This Amendment contains the entire understanding between the parties with respect to the matters contained herein. Except as modified by this Amendment, the Lease shall remain unchanged and shall continue in full force and effect. No representations, warranties, covenants or agreements have been made concerning or affecting the subject matter of this Amendment, except as are contained herein and in the Lease. This Amendment may not be

2



changed orally, but only by an agreement in writing signed by the party against whom enforcement of any waiver, change or modification or discharge is sought.

     c)     This Amendment may be executed in any number of identical counterparts each of which shall be deemed to be an original and all, when taken together, shall constitute one and the same instrument. A facsimile or similar transmission of a counterpart signed by a party hereto shall be regarded as signed by such party for purposes hereof.

     d)     Submission of this instrument for examination and signature by Tenant does not constitute an offer to lease or a reservation of or option for lease, and this instrument is not effective as a lease amendment or otherwise until executed and delivered by both Landlord and Tenant.

     IN WITNESS WHEREOF, Landlord and Tenant have executed and delivered this First Amendment as of the date and year first above written.

WITNESSES

TENANT:

**PRGI, Inc.**
a Florida corporation

By: _Sushma Chhabra_
Print Name: _Sushma Chhabra_

Print Name: _Sabine Farugu_

Print Name: _Amy Carroll_

Date: ___1/7___, 2015

**Online Education Ventures, LLC**
a Florida limited liability company

By: _Sushma Chhabra_
Print Name: _Sushma Chhabra_

Print Name: _Sabine Farugu_

Print Name: _Amy Carroll_

Date: ___1/7___, 2015

[Additional Signature pages to follow]

3

**CareHQ, Inc.**
a Deleware corporation

By: _____
Print Name: _Sushma  Chhabra_

Date: _____1/7_____, 2015

**3RX Consulting, LLC**
a Florida limited liability company

By: _Amy Roy—Haeger_
Print Name: _Amy Roy—Haeger_

Date: _____1/7_____, 2015

**Law Firm Headquarters, LLC**
a Nevada limited liability company

By: _Diane Sugimoto_
Print Name: _Diane  Sugimoto_

Date: _____1/7_____, 2015

**Excelium Management, LLC**
a Florida limited liability company

By: _Diane Sugimoto_
Print Name: _Diane Sugimoto_

Date: _____1/7_____, 2015

Print Name: _Amy Carroll_

Print Name: _Sabina Farugi_

Print Name: _Amy Carroll_

Print Name: _Sabina Farugui_

Print Name: _Amy Carroll_

Print Name: _Sabina farugi_

Print Name: _Amy Carroll_

Print Name: _Sabina farugi_

[Landlord Signature page to follow]

4

WITNESSES:

Print Name: _OLISA Nelson_

Print Name: _Tyler Harrow_

LANDLORD:

**RADICE III, LLC,**
a Florida limited liability company

By: _____
Print Name: _Leo Chity_

Date: _1/7/15_____, 2015

Amendment PREI Lease      5

## SECOND AMENDMENT TO LEASE

THIS SECOND AMENDMENT TO LEASE (this "**Amendment**") is made this 9th day of February, 2016 by and between RADICE III, LLC, a Florida limited liability company ("Landlord"), and PRGI, Inc., a Florida corporation, Online Education Ventures, LLC, a Florida limited liability company, CareHQ, Inc. a Delaware corporation, 3RX Consulting, LLC, a Florida limited liability company, Excelium Management, LLC, a Florida limited liability company, (jointly and severally referred to as "Tenant"):

### RECITALS:

A.    Landlord and Tenant entered into that Office Lease Agreement dated January 7, 2015 and First Amendment to Lease dated January 7, 2015 (collectively the "**Lease**"), relating to Suites 500 & Suite 600 (the "**Premises**") located in Radice Corporate Center III, 1000 Corporate Drive, Fort Lauderdale, Florida 33334 (the "**Building**").

B.    Landlord and Tenant desire to amend the Lease pursuant to the terms and conditions hereinafter described.

C.    All capitalized terms used in this Amendment shall have the meanings given to them in the Lease, as amended hereby, unless otherwise defined herein.

### AGREEMENT:

NOW, THEREFORE, in consideration of the premises and the mutual covenants herein contained, the parties hereby amend the Lease on the terms hereof effective as of the date hereof, notwithstanding anything to the contrary contained therein:

1.    **Rent Arrearage**. Tenant acknowledges that it is currently in default of the Lease for failing to pay Base Rent and Additional Rent in the amount of $109,340.21 through January 31, 2016. Landlord hereby agrees to forbear from taking any legal action to enforce the default provided Tenant complies with the Rent Arrearage Repayment Schedule set forth in Section 2 below.

2.    **Rent Arrearage Repayment Schedule**. Tenant shall make the following payments to cure the default and bring its rental obligations current:

| Payment Date | Amount of Payment | Payment to be applied to: |
|---|---|---|
| Thursday, Feb. 11, 2016 | $50,000.00 | First half of Jan 2016 rent |
| Thursday, Feb. 18, 2016 | $50,000.00 | Second half of Jan 2016 rent |
| Thursday, Feb. 25, 2016 | $50,000.00 | First half of Feb 2016 rent |
| Thursday, Mar. 3, 2016 | $50,000.00 | Second half of Feb 2016 rent |
| Thursday, Mar. 10, 2016 | $50,000.00 | First half of March 2016 rent |
| Thursday, Mar. 17, 2016 | $50,000.00 | Second half of March 2016 rent |
| Friday, April 1, 2016 | $100,000.00 | April 2016 rent in full |



Tenant hereby acknowledges that time is of the essence with respect to all payments due. All payments shall be made by wire transfer pursuant to the wire instructions attached hereto as Exhibit "A." In the event Tenant fails to initiate the wire for each payment on or before 5:00 P.M. on the date due, such failure shall be deemed an immediate event of default, entitling Landlord to pursue its remedies under the Lease, without any notice to Tenant, as Tenant hereby expressly waives such notice. Commencing May 1, 2016 Tenant shall re-commence making Rent payments as required under the Lease. Any Additional Rent payments incurred by Tenant during the period from February 1, 2016 through April 30, 2016 not accounted for in the amounts due above, (i.e. extended HVAC charges) shall be due with the Rent payment due on May 1, 2016.

3.    **Tenant Improvements**. Tenant hereby acknowledges that it is in the process of making improvements to Suite 600 of the Premises ("Tenant Improvements"). Tenant hereby agrees to substantially complete the Tenant Improvements and obtain a certificate of occupancy (or its equivalent) from the City of Fort Lauderdale on or before June 15, 2016 (time being of the essence). Tenant's failure to obtain a certificate of occupancy for the Tenant Improvements by June 15, 2016 shall be deemed an event of default under the Lease.

4.    **Confidentiality.** In consideration for Landlord providing Tenant with rent relief as stated herein, Tenant hereby agrees, except its attorneys, accountants, or such other person as required by law, unless otherwise agreed to in writing by Landlord, Tenant shall keep the material terms of the Amendment (such as the rent price) confidential and not to disclose the material terms to any person without the Landlord's prior written consent. Tenant hereby agrees that Tenant's breach of the covenant contained in this Section 4 of this Amendment shall be deemed a breach of the Lease, and in addition to any and all other remedies available to Landlord under the Lease, Tenant agrees that Landlord shall be entitled to equitable relief by way of injunction or otherwise upon the breach or threatened breach of Section 4 of this Amendment. It is further understood and agreed that no failure or delay by Landlord in exercising any right, power or privilege hereunder shall operate as a waiver thereof, nor shall any single or partial exercise thereof preclude any other or further exercise thereof or the exercise of any right, power or privilege hereunder.

5.    **Attorney's Fees.** Tenant shall pay to Landlord as Additional Rent, Landlord's attorney's fees incurred in connection with the preparation of this Second Amendment.

6.    **Miscellaneous**.

a)    Except as modified by this Amendment, the Lease and all the terms, covenants, conditions and agreements thereof are hereby in all respects ratified, confirmed and approved. Tenant hereby affirms that on the date hereof no breach or default by either party has occurred and that the Lease, and all of its terms, conditions, covenants, agreements and provisions, except as hereby modified, are in full force and effect with no defenses or offsets thereto, and Tenant hereby releases Landlord of and from all liabilities, claims, controversies, causes of action and other matters of every nature which, through the date hereof, have or might have arisen out of or in any way in connection with the Lease and/or the Premises demised thereunder.



b)      This Amendment contains the entire understanding between the parties with respect to the matters contained herein.  Except as modified by this Amendment, the Lease shall remain unchanged and shall continue in full force and effect.  No representations, warranties, covenants or agreements have been made concerning or affecting the subject matter of this Amendment, except as are contained herein and in the Lease.  This Amendment may not be changed orally, but only by an agreement in writing signed by the party against whom enforcement of any waiver, change or modification or discharge is sought.

c)      This Amendment may be executed in any number of identical counterparts each of which shall be deemed to be an original and all, when taken together, shall constitute one and the same instrument.  A facsimile or similar transmission of a counterpart signed by a party hereto shall be regarded as signed by such party for purposes hereof.

d)      Submission of this instrument for examination and signature by Tenant does not constitute an offer to lease or a reservation of or option for lease, and this instrument is not effective as a lease amendment or otherwise until executed and delivered by both Landlord and Tenant.

Signature Pages to Follow:

3



IN WITNESS WHEREOF, Landlord and Tenant have executed and delivered this Second Amendment as of the date and year first above written.

WITNESSES

TENANT:

**PRGI, Inc.**
a Florida corporation

By: _Sushma Chhabra_
Print Name: _Sushma Chhabra_

Print Name: _Sabina Faruqui_

Print Name: _Bill Patten_

Date: _2/10/_____, 2016

**Online Education Ventures, LLC**
a Florida limited liability company

By: _Diane Sugimoto_
Print Name: _Diane Sugimoto_

Print Name: _Sabina Faruqui_

Print Name: _Bill Patten_

Date: _2/10_____, 2016

**CareHQ, Inc.**
a Delaware corporation

By: _Diane Sugimoto_
Print Name: _Diane Sugimoto_

Print Name: _Sabina Faruqui_

Print Name: _Bill Patten_

Date: _2/10_____, 2016

[Additional Signature page to follow]

4

**3RX Consulting, LLC**
a Florida limited liability company

By: _____
Print Name: _____

Print Name: _____

Date: _____, 2016

**Law Firm Headquarters, LLC**
a Nevada limited liability company

By: _Diane Sugimoto_
Print Name: _Diane Sugimoto_

Print Name: _Sabina Farugui_

Print Name: _Bill Patten_

Date: _2|10_, 2016

**Excelium Management, LLC**
a Florida limited liability company

By: _Diane Sugimoto_
Print Name: _Diane Sugimoto_

Print Name: _Sabina Farugui_

Print Name: _Bill Patten_

Date: _2|10_, 2016

WITNESSES:

LANDLORD:

**RADICE III, LLC,**
a Florida limited liability company

By: _____
Print Name: _Leo G.A.M._
_McNajer_

Print Name: _____

Print Name: _____

Date: _2|16|16_, 2016

5

EXHIBIT A

WIRE INSTRUCTIONS

**Payee: Radice III, LLC**

**Bank Account Number:** ●●●●●8210
**Bank: Union Bank**
**City: Los Angeles**
**State: California**
**ABA Number: 122000496**
**Account Name: Radice III**
**Account Type: Checking**